Edwin L. Lobdell *et al.*

*v.*

The City of Chicago *et al.*

*Opinion filed April 18, 1907—Rehearing denied June 5, 1907.*

1. MUNICIPAL CORPORATIONS—*privilege of operating street railway is property.*  The privilege of constructing and operating a street railway is a property right, for which a city may exact compensation when granting the privilege; but the fact that the city may also grant such privilege gratuitously does not make the property right any the less valuable to the company upon which the privilege is conferred.

2. MORTGAGES—*mortgage of street railway line covers the right to operate the line.*  A mortgage or trust deed covering a railroad or street railway line covers not only the rails, ties, poles and other component parts of the line, but also the right to operate the line as a railroad or street railway.

3. CONSTITUTIONAL LAW—*street railway certificates issued under the Mueller law create an indebtedness of the city.*  Street railway certificates issued under section 2 of the Mueller law (Laws of 1903, p. 287,) create an indebtedness against the city, where, by their terms and the terms of the mortgage or trust deed securing them, the street railway property purchased therewith, together with the right to operate such railways for a period of twenty years after a foreclosure sale, is pledged to secure their payment.

4. SAME—*when the issue of street railway certificates is illegal.*  Where a city is indebted so near to its constitutional limit that the amount represented by street railway certificates issued under section 2 of the Mueller law, added to the existing indebtedness, will make a sum in excess of the amount of indebtedness the city may constitutionally incur, the issue of such certificates is illegal.

5. SAME—*a right of action against city is not essential to an indebtedness.*  The mere fact that certificates issued by a city expressly preclude the holder from bringing an action against such city, does not, of itself, prevent the issue and sale of such certificates from creating an indebtedness against the city, where property of the city other than the tangible property, and its income, purchased with the proceeds of sale of such certificates, is pledged to secure the payment of the certificates.  (*City of Joliet v. Alexander,* 194 Ill. 457, followed.)

APPEAL from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

SHOPE, MATHIS, ZANE & WEBER, SCOTT, BANCROFT, LORD & STEPHENS, and PRUSSING, BROWN & KING, (SIMEON P. SHOPE, HARRY P. WEBER, FRANK H. SCOTT, EDGAR A. BANCROFT, and EUGENE E. PRUSSING, of counsel,) for appellants Edwin L. Lobdell *et al.*:

A grant to a public utility company to occupy and use the streets of a municipality is a grant of a special privilege. *Water Co.* v. *Fergus,* 178 Ill. 576; 180 U. S. 624; *Goddard* v. *Railway Co.* 202 Ill. 362.

The purpose of section 12 of article 9 of the constitution was to protect persons residing in municipalities from the abuse of their credit, and the consequent oppression of burdensome or ruinous taxation. The incurring of indebtedness beyond the amount specified is absolutely and unqualifiedly prohibited, no matter what the pretext or circumstances or the form,—whether inchoate or completely consummated,—which the indebtedness is made to assume. It curbs equally the power of the legislature, the officials and the people themselves, and was designed to protect the taxpayers from the folly and improvidence of any or all combined. *Law* v. *People,* 87 Ill. 385; *Springfield* v. *Edwards,* 84 id. 626; *Ottumwa* v. *Supply Co.* 119 Fed. Rep. 315.

The words "debt" and "indebtedness," as used in the constitution, are to be deemed as employed by the framers of that instrument in the generally accepted sense of those words. *Springfield* v. *Edwards,* 84 Ill. 626; *Law* v. *People,* 87 id. 385; *Chicago* v. *Galpin,* 183 id. 399.

Where a city is indebted up to its constitutional limit, if it becomes liable for any amount in the future, whether that amount be definitely ascertained at the date of the contract or not, it thereby incurs an indebtedness "in some manner, for some purpose" in violation of the constitution. *Chicago* v. *McDonald,* 176 Ill. 404.

Where a municipal corporation acquires, by purchase or construction, a public utility plant, the price or cost of which is met by the issuance of formal interest-bearing obligations,

by their terms payable, both principal and interest, out of a special fund created and maintained from the revenues or earnings of the plant and payment secured by a mortgage or deed of trust upon the plant and its earnings, the transaction, in both its legal and commercial aspects, is essentially one of borrowing money, the relation of debtor and creditor is created, property of the municipality is impressed with a lien to the extent of such indebtedness, and is liable to be taken in payment thereof in case the obligation is not discharged at maturity or in the event of a default by the municipality in the performance of its duties relative thereto, and the municipality becomes indebted, within the meaning of the constitution. *Joliet* v. *Alexander*, 194 Ill. 457; *Eddy Valve Co.* v. *Crown Point*, 76 N. E. Rep. 536; *Water-works Co.* v. *Trebilcock*, 99 Mich. 454; *Woodbridge* v. *Duluth*, 57 Minn. 256.

The right to operate street railways in the streets for twenty years is a property right carved out of the city's interest in the streets, and is conveyed by this mortgage or deed of trust to secure payment of the street railway certificates. *Railroad Co.* v. *Delamore*, 114 U. S. 501; *Litchfield* v. *Ballou*, 114 U. S. 190; *People* v. *Telephone Co.* 92 Ill. 307; *Gas Light Co.* v. *Town of Lake*, 130 id. 44; *Railway Co.* v. *People*, 73 id. 541; *Belleville* v. *Railway Co.* 102 id. 171; *Chicago* v. *Baer*, 41 id. 306; *Harlem* v. *Railroad Co.* 198 id. 337; *Railway Co.* v. *Chicago*, 176 id. 501; *Rich* v. *Chicago*, 152 id. 18.

The use of its streets for street railway purposes is a lawful source of income to the city, which, by the execution of the proposed mortgage or deed of trust, the city surrenders to the purchaser at foreclosure sale. *Byrne* v. *Railway Co.* 169 Ill. 75; *Railway Co.* v. *Chicago*, 176 id. 253; *Alleghany* v. *Railway Co.* 159 Pa. St. 411.

CHARLES H. ALDRICH, and HENRY CRAWFORD, for appellants Nelson Thomasson, Jr., and Henry S. McAuley.

WALTER L. FISHER, and SAMUEL ADAMS, (JAMES HAM-
ILTON LEWIS, Corporation Counsel, of counsel,) for appel-
lees:

The ordinance of January 18 was not invalid, as attempt-
ing to include in the mortgage, property other than that
acquired or to be acquired through the issuance of the cer-
tificates, for when all of its parts are considered it makes no
such attempt. But if the ordinance should be construed as
attempting to mortgage property not acquired or to be ac-
quired by the use of the certificates it is invalid to that
extent only, and gives authority for the execution of a mort-
gage and certificates free from such illegal attempt. *Denver*
v. *Hallett*, 83 Pac. Rep. 1066; *Culberson* v. *Fulton*, 127
Ill. 30; *Turner* v. *Woodson County*, 27 Kan. 314; *Colum-
bus* v. *Institute of Savings*, 114 Fed. Rep. 162; *Gray* v.
*Bourgeois*, 107 La. 671; *Bank* v. *Terrell*, 78 Tex. 450;
*Railroad Co.* v. *Osage County*, 38 Kan. 597; *Insurance Co.*
v. *Lyon County*, 95 Fed. Rep. 325; *Rathbone* v. *Kiowa
County*, 73 id. 395; *Finlayson* v. *Vaughan*, 54 Minn. 331;
*Schmitz* v. *Zeh*, 97 N. W. Rep. 1049; *Stockdale* v. *School
District*, 47 Mich. 226; *Vaughn* v. *School District*, 39 Pac.
Rep. 393; *Dunn* v. *Great Falls*, 13 Mont. 58; *McPherson*
v. *Foster*, 43 Iowa, 48; *Railway Co.* v. *People*, 200 Ill. 541.

Certificates issued by the city, secured by a mortgage
only of property purchased with the certificates or their pro-
ceeds, said certificates to be paid only out of the earnings
of the property so purchased, are in no sense an indebted-
ness of the city. *Joliet* v. *Alexander*, 194 Ill. 467.

A city does not become indebted by the mere acquisition
of an option to take and pay for something in the future.
*Hay* v. *Springfield*, 64 Ill. App. 671; *Bailey* v. *Sioux Falls*,
103 N. W. Rep. 16; *Windsor* v. *DesMoines*, 81 id. 476;
*South Bend* v. *Reynolds*, 49 L. R. A. 795.

Where, by the terms of the contract, the creditor is re-
quired to look for payment exclusively to a special fund
arising only from the fulfillment of the contract, such con-

tract does not create an indebtedness of the municipality. This is the familiar case of special assessment bonds. *Quill* v. *Indianapolis,* 124 Ind. 292; 20 Am. & Eng. Ency. of Law, 1176.

Where a city acts under a law stipulating against its liability, it cannot become liable even with its own consent. *Chicago* v. *Brede,* 218 Ill. 528; *Hall* v. *Chippewa Falls,* 47 Wis. 267.

The contention that the certificates are an indebtedness because the city is mortgaging its property to pay for them and in agreeing that in case of foreclosure the purchaser shall have the right to operate, is untenable for the following reasons: (1) No franchise is mortgaged,—*i. e.,* there is no right granted to operate until after the sale, and then the right is very different from that which the city or its lessees had before the sale; (2) the right is a mere conditional grant, taking effect in the future; (3) the city is not mortgaging its property, as it has no property in the streets. *Alton* v. *Transportation Co.* 12 Ill. 38; *Field* v. *Barling,* 149 id. 556; *Smith* v. *McDowell,* 148 id. 51.

The right to operate upon certain streets, which may be granted by the city to street railway corporations, is not a property right of the city, as it may be given away for nothing, or granted on such terms as the city council may elect, without question by tax-payers. *Railway Co.* v. *Chicago,* 176 Ill. 253; *Summerfield* v. *Chicago,* 197 id. 270.

Section 12 of article 4 of the constitution can only apply to obligations of a definite or immediately ascertainable amount, for it is impossible to say whether obligations whose amount is not fixed do or do not exceed five per cent of the assessed valuation. *Chicago* v. *Galpin,* 183 Ill. 389.

Mr. JUSTICE HAND delivered the opinion of the court:

This was a bill in chancery filed by Edwin L. Lobdell and other citizens and tax-payers of the city of Chicago, for and on behalf of themselves and all other citizens and tax-

payers of the city of Chicago who might choose to become parties to the said bill, in the circuit court of Cook county, against the city of Chicago, Edward F. Dunne, mayor of said city, L. E. McGann, comptroller of said city, and Adrian C. Anson, city clerk of said city, to enjoin the printing and issuing of $75,000,000 of street railway certificates under the provisions of an act entitled "An act to authorize cities to acquire, construct, own, operate and lease street railways, and to provide the means therefor," approved May 18, 1903, in force July 1, 1903, (Hurd's Stat. 1905, p. 438,) which act is commonly called the Mueller law, and which act was adopted by the city of Chicago at an election held on April 5, 1904, and two ordinances of the city of Chicago, bearing date, respectively, January 18, 1906, and May 28, 1906, which ordinance bearing date January 18, 1906, was adopted by the votes of a majority of the electors of said city at an election held on April 3, 1906. The ordinance of May 28, 1906, was never submitted to the electors of said city for adoption. The defendants filed a general demurrer to said bill, which demurrer was sustained, and the complainants having elected to stand by their bill, the same was dismissed for want of equity, and they have prosecuted an appeal to this court to reverse the decree of the circuit court.

The Mueller law provides that every city in this State in which the law is in force shall have the power to own, construct, acquire, purchase, maintain and operate street railways within its corporate limits, and to lease the same, or any part thereof, to any company incorporated under the laws of this State for the purpose of operating street railways, for any period not longer than twenty years, on such terms and conditions as the city council shall deem for the best interests of the public, but that no city shall proceed to operate street railways unless the proposition to operate shall first have been submitted to the electors of such city as a separate proposition and approved by three-fifths of the voters voting thereon. On April 3, 1906, the proposition to

operate street railways in the city of Chicago was submitted to the electors of said city and was defeated. If the city of Chicago, therefore, should construct or acquire the street railways of the city of Chicago through the issue of said $75,000,000 street railway certificates, it would necessarily have to lease the same to some corporation incorporated under the laws of this State for the purpose of operating street railways, which lease could not be for a longer period than twenty years. The act also provides no ordinance authorizing a lease for a longer period than five years, nor any ordinance renewing any lease, shall go into effect until the expiration of sixty days from and after its passage, and if, within such sixty days, there is filed with the city clerk of said city a petition, signed by ten per cent of the voters voting at the last preceding election for mayor in said city, asking that such ordinance be submitted to a popular vote, then such ordinance shall not go into effect unless the question of the adoption of such ordinance shall first be submitted to the electors of such city and approved by a majority of those voting thereon.

Two methods are provided by the act for obtaining funds with which to acquire and equip street railways: First, any city in which the act is in force may borrow money and issue its negotiable bonds therefor, pledging the faith and credit of the city, but no such bonds shall be issued unless the proposition to issue the same shall first have been submitted to the electors of such city and approved by two-thirds of those voting thereon, nor in any amount in excess of the cost to the city of the property for which said bonds are issued, ascertained as elsewhere provided in this act, and ten per cent of such cost in addition thereto; and secondly, by the issue of street railway certificates, the issue of which certificates is regulated and controlled by section 2 of the act, which reads as follows:

"Sec. 2. In lieu of issuing bonds pledging the faith and credit of the city, as provided for in section 1 of this act,

any city may issue and dispose of interest-bearing certificates, to be known as 'street railway certificates,' which shall, under no circumstances, be or become an obligation or liability of the city or payable out of any general fund thereof, but shall be payable solely out of a specified portion of the revenues or income to be derived from the street railway property for the acquisition of which they were issued. Such certificates shall not be issued and secured on any street railway property in amount in excess of the cost to the city of such property as hereinbefore provided, and ten (10) per cent of such cost in addition thereto. In order to secure the payment of any such street railway certificates and the interest thereon, the city may convey, by way of mortgage or deed of trust, any or all of the street railway property acquired or to be acquired through the issue thereof; which mortgage or deed of trust shall be executed in such manner as may be directed by the city council and acknowledged and recorded in the manner provided by law for the acknowledgment and recording of mortgages of real estate, and may contain such provisions and conditions not in conflict with the provisions of this act as may be deemed necessary to fully secure the payment of the street railway certificates described therein. Any such mortgage or deed of trust may carry the grant of a privilege or right to maintain and operate the street railway property covered thereby, for a period not exceeding twenty (20) years from and after the date such property may come into the possession of any person or corporation as the result of foreclosure proceedings; which privilege or right may fix the rates of fare which the person or corporation securing the same as the result of foreclosure proceedings shall be entitled to charge in the operation of said property for a period not exceeding twenty (20) years. Whenever, and as often as default shall be made in the payment of any street railway certificates issued and secured by a mortgage or deed of trust, as aforesaid, or in the payment of the interest thereon when due, and any

227—15

such default shall have continued for the space of twelve (12) months, after notice thereof has been given to the mayor and financial officer of the city issuing such certificates, it shall be lawful for any such mortgagee or trustee, upon the request of the holder or holders of a majority in amount of the certificates issued and outstanding under such mortgage or deed of trust, to declare the whole of the principal of all such certificates as may be outstanding, to be at once due and payable, and to proceed to foreclose such mortgage or deed of trust in any court of competent jurisdiction. At a foreclosure sale, the mortgagee or the holders of such certificates may become the purchaser or purchasers of the property and the rights and privileges sold, if he or they be the highest bidders. Any street railways acquired under any such foreclosure shall be subject to regulation by the corporate authorities of the city to the same extent as if the right to construct, maintain and operate such property had been acquired through a direct grant without the intervention of foreclosure proceedings: *Provided, however,* that no street railway certificates or mortgage shall ever be issued by any city under the provisions of this act unless and until the question of the adoption of the ordinance of the city council making provision for the issue thereof shall first have been submitted to a popular vote and approved by a majority of the qualified voters of the city voting upon such question."

The ordinance of January 18, 1906, as supplemented by the ordinance of May 28, 1906, makes provision for the printing and issuing of the street railway certificates of the city of Chicago to the amount of $75,000,000. The ordinance of January 18 contains blank forms of the street railway certificates which are to be issued and the trust deed or mortgage which is to be executed to secure their payment. The certificates, as modified by the ordinance of May 28, which modification is indicated by italics, in part read as follows:

"For value received, the city of Chicago hereby promises to pay to the bearer hereof the sum of......in gold coin of the United States of America of the present or an equal standard of weight and fineness, on the first day of July, A. D. 190.., and to pay interest thereon in like gold coin at the rate of five per cent (5%) per annum, payable semi-annually, on the first days of January and July in each year, until paid, on presentation and surrender of the annexed interest coupons as they respectively become due. Both the principal hereof and the interest hereon shall be payable at the office of the city treasurer of the city of Chicago in the city of Chicago, Illinois. This certificate is one of a series of 141,000 certificates of like tenor and date, numbered consecutively from one to 141,000, both inclusive, for the aggregate principal amount of $75,000,000, those in series A, numbered from one to 65,000, both inclusive, being for $1000 each; those in series B, numbered from 65,001 to 75,000, both inclusive, being for $500 each; those in series C, numbered from 75,001 to 120,000, both inclusive, being for $100 each; those in series D, numbered from 120,001 to 126,000, both inclusive, being for $50 each; those in series E, numbered from 126,001 to 131,000, both inclusive, being for $20 each; and those in series F, numbered from 131,001 to 141,000, both inclusive, being for $10 each; all of which are equally secured by mortgage or deed of trust bearing even date herewith, made by the city of Chicago to the................as trustee, and covering the whole of the street railways owned by the city of Chicago or hereafter acquired by said city, and all of its stations, cars, equipment, rights, franchises and property of all kinds, real and personal, obtained or held for use in connection with its said street railways, whether now owned or hereafter acquired, *so far as such street railways and other property are acquired or shall be acquired through the use of said street railway certificates.* Whenever default shall be made in the payment of any interest coupon hereon, and such default shall have

continued for the space of twelve months after notice thereof has been given to the mayor and financial officer of the city of Chicago, it shall be lawful for the trustee herein, upon the request of the holder or holders of a majority, in amount, of the certificates issued and outstanding under said mortgage or deed of trust, to declare the whole of the principal of all such certificates as may be outstanding to be at once due and payable and to proceed to foreclose such mortgage or deed of trust in any court of competent jurisdiction. It is agreed by the holder hereof that this street railway certificate shall under no circumstances be or become an obligation or a liability of the city or payable out of any general fund thereof, but shall be payable solely out of that portion of the revenue or income derived from the said street railway properties specified in said mortgage or trust deed."

And the trust deed or mortgage contained in the ordinance of January 18, as modified by the ordinance of May 28, which modification is also italicized, in part reads as follows:

"For and in consideration of the premises and the sum of one dollar ($1) cash in hand paid to the party of the first part hereto by the party of the second part hereto upon the ensealing and delivering of these presents, the receipt of which is hereby acknowledged, and in order to secure the payment of said street railway certificates, and the interest thereon, according to the tenor of said street railway certificates and the interest coupons thereto, respectively, attached, the said city has granted and conveyed, and by these presents does grant and convey, unto the party of the second part hereto, its successors in trust and assigns, forever, the following described premises, properties, rights and franchises, to-wit: All of the street railways of the party of the first part located in, upon and along all of the streets and public places in the city of Chicago, as well as all such as are located upon private rights of way, with all the tracks, poles, wires, cables, rights of way, motors, equipment, ma-

chinery, tools, appliances, power houses, car barns, and supplies, leases, contracts, rights, privileges, franchises and property of all kinds of the party of the first part hereto, obtained for or used upon or for or in connection with the operation of its railways, and whether now owned or hereafter acquired, *so far as such street railways and other property are acquired or shall be acquired through the issue of said street railway certificates.* To have and to hold all of said railways, premises, properties, rights and franchises, of all kinds, hereby conveyed and intended to be conveyed, with the appurtenances thereunto belonging and the rents, issues and profits thereof, unto the party of the second part, its successors and assigns, but in trust, nevertheless, for the equal benefit and security of the holders of said street railway certificates, at whatever period the same may be issued, without preference or priority of one street railway certificate over another, except as herein otherwise provided, and for the uses and purposes and upon the terms, agreements and conditions hereinafter set forth, as follows:    *    *    *

"*Article 2.*—So long as no default shall be made in the payment of the principal or the interest of the said street railway certificates, and so long as the conditions of this trust deed shall be performed, the said first party, its successors, assigns or lessees, shall be permitted to retain the possession, operation, enjoyment and control, as heretofore, of said mortgaged property and of its income and profits; but the said first party, for itself, its successors, assigns or lessees, agrees to pay promptly, but solely out of the property hereby conveyed, all charges against said property, so that the priority of these presents, as hereinafter stipulated, shall at all times be duly maintained and preserved, and to take care of and preserve the said property conveyed hereby, and to do, on demand of the said trustee or its successors, all acts necessary or proper to keep valid the lien hereby created and intended to be created, and at any future time, and as often as may be necessary, to execute, on demand of

the said trustee or its successors, all such other assurances, deeds, mortgages and other instruments of writing in due form and effect, as may be proper for the better carrying out of the true intent and meaning of these presents, and especially, and at its own cost, do all things that may reasonably be required by the said second party or its successors to make and keep valid the lien intended to be created upon any property hereafter acquired.

"*Article 3.*—Whenever and as often as default shall be made in the payment of any of said street railway certificates at their maturity, or in the payment of the interest thereon when due, and any such default in the payment of interest shall have continued for the space of twelve months after notice thereof has been given to the mayor and financial officer of the city of Chicago, then and in any such event the trustee hereunder may, upon the request of the holder or holders of a majority, in amount, of the street railway certificates issued and outstanding under this trust deed, and upon being indemnified to its satisfaction, take and maintain possession of all and singular the estate, property, premises, rights and franchises hereby conveyed or intended to be conveyed, and as the attorney in fact or agent of the party of the first part hereto, or in its own name, as trustee, by itself and its agents and substitutes duly appointed, or by managers, superintendents, receivers or servants, have, hold, use, manage, operate and enjoy same, and each part thereof, and the income, issues and profits therefrom, to as full an extent as the party of the first part, its successors, assigns or lessees, might lawfully do, making, from time to time, all needful and proper repairs, alterations and additions, and receiving all tolls, incomes, revenues, rents and profits from said mortgaged property, and after deducting and defraying the expenses of such use, operation, repairs, alterations and additions, and the costs and charges of taking such possession, and all payments which may be made for charges or liens, prior to the lien of this mortgage, upon said mort-

gaged property or any part thereof, and reasonable and proper compensation for taking such possession and management while in its possession, and such sum or sums as may be sufficient to indemnify, the trustee against any liability, loss or damage for on or account of any matter or thing done in good faith in pursuance of the duties of the trustee hereunder, the said trustee shall apply the net remaining income and revenue from said mortgaged property, without preference, priority or discrimination of one street railway certificate over another, ratably and equally, to the payment of the principal and accrued and accruing interest due on said street railway certificates outstanding and intended to be secured hereby.

"*Article 4.*—Whenever and as often as default shall be made in the payment of the interest on any of the street railway certificates issued hereunder, when due, and such default shall have continued for the space of twelve months after notice thereof has been given of such non-payment to the mayor and the financial officer of the city of Chicago, then and in any such event the trustee hereunder may, at the request of the holder or holders of the majority, in amount, of the said street railway certificates then outstanding, declare the whole of the principal of all the outstanding street railway certificates hereby secured at once due and payable, without any notice whatever, and upon such declaration the whole of the principal of all of said street railway certificates shall at once become due and payable and the lien hereby created may be enforced for the whole debt; and in such event, or in case default shall be made in payment of the principal of any of said street railway certificates at their maturity, it shall be the duty of said trustee or its successor in trust, upon the written request of the holder or holders of the majority, in amount, of the said street railway certificates then outstanding hereunder, to at once institute and carry on such suits and proceedings to foreclose the lien of this trust deed as may be authorized for a foreclosure there-

of. The trustee shall first defray the expenses of fore-closure, together with just and reasonable charges for its services, including reasonable attorneys' and counsel fees, and also all advances and expenses reasonably made by the trustee hereunder, and shall apply the balance of said proceeds ratably to the payment of the street railway certificates secured hereby, and all interest thereon, computed to the time of making the payment, and if any of said proceeds shall then remain, such remainder shall be turned over to the party of the first part hereto. In case of the filing of any bill to foreclose this trust deed by the trustee, as here-in above provided, the complainant in said bill shall be en-titled to the appointment of a receiver forthwith, and at any sale of any of the mortgaged property and franchises cov-ered hereby, the trustee may, at the written request of the majority, in interest, of the holders of the then outstanding street railway certificates, bid in and purchase, in person or by attorney, the said mortgaged property in behalf of the holders of all of the outstanding street railway certificates hereby secured.

*"Article 5.*—In the event that this trust deed shall be foreclosed by reason of any of the defaults hereinbefore de-clared to be a cause of foreclosure, there shall be a sale of all the property, both real and personal, and rights and fran-chises hereby mortgaged, and then and in such event the title to all the property hereby mortgaged, both real and personal, (exclusive of franchises and operating rights,) shall vest in the purchaser at such foreclosure sale; and the purchaser at such foreclosure sale, in addition thereto, shall have the right to construct, maintain and operate the said street railways, property, rights and franchises hereby mort-gaged, during the period of twenty years from and after the date of such sale, subject to all of the requirements in the general ordinances of the city of Chicago and subject to the control and regulation of the corporate authorities of said city of Chicago, to the same extent as if said property

had been obtained through direct grant, without the intervention of foreclosure proceedings, *it being clearly understood that the control and regulation of the authorities of the said city of Chicago shall extend to the reasonable regulation, from time to time during said period of twenty years, of rates of fare to be charged in the operation of said street railway property, as well as all other matters that would be subject to such control and regulation if said property had been obtained through direct grant."*

It is averred in the bill that the total assessed valuation of all of the taxable property in said city of Chicago, as shown by the equalized assessment for State and county taxes for the year 1905, was the sum of $407,991,625, and that the then total indebtedness of the city was the sum of $20,298,985.86. It is therefore evident that the city of Chicago had so nearly exhausted its debt-creating power under the constitution, that if it is held said street railway certificates are indebtedness of the city, within the limitations found in the constitution, the issue of said certificates would be in violation of the constitution and void.

We think it self-evident, from a consideration of the statute and the ordinances under which the city of Chicago is proposing to issue said $75,000,000 of street railway certificates, and the terms of said street railway certificates and the trust deed or mortgage which is to be executed to secure their payment, that the object of the legislation, as evidenced by the Mueller law and said ordinances and the contract relations with the certificate holders which the city proposes to assume by the issue of said certificates and the execution of said trust deed or mortgage, in view of the existing indebtedness of the city, when considered as a whole, is an attempt to provide funds with which to municipalize the street railways of the city of Chicago without violating the provisions of section 12 of article 9 of the constitution of 1870, which reads as follows: "No county, city, township, school district, or other municipal corporation, shall be al-

lowed to become indebted in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five percentum on the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes, previous to the incurring of such indebtedness. Any county, city, school district, or other municipal corporation, incurring any indebtedness as aforesaid, shall before, or at the time of doing so, provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof within twenty years from the time of contracting the same." And the main question in this case is, will said street railway certificates, if issued, create an indebtedness of the city of Chicago within the meaning of said constitutional inhibition?

In *Law* v. *People*, 87 Ill. 385, on page 396, it was said: "The clear and unmistakable purpose of the framers of the organic law, by inserting this provision, was to effectually protect persons residing in municipalities from the abuse of their credit, and the consequent oppression of burthensome, if not ruinous, taxation."

In *City of Springfield* v. *Edwards*, 84 Ill. 626, on page 632, the court said: "The prohibition is against becoming indebted,—that is, voluntarily incurring a legal liability to pay, *'in any manner or for any purpose,'* when a given amount of indebtedness has previously been incurred." And the court, in the same opinion, defined the character of the indebtedness which the constitutional prohibition was intended to cover. It was there said (p. 632) : "A debt payable in the future is, obviously, no less a debt than if payable presently; and a debt payable upon a contingency, as upon the happening of some event, such as the rendering of service or the delivery of property, etc., is some kind of a debt, and therefore within the prohibition. If a contract or undertaking contemplates, in any contingency, a liability to pay, when the contingency occurs the liability is absolute,—

the debt exists,—and it differs from a present, unqualified promise to pay, only in the *manner* by which the indebtedness was incurred; and, since the *purpose* of the debt is expressly excluded from consideration, it can make no difference whether the debt be for necessary current expenses or for something else."

The doctrine of these cases has been frequently approved by this court. (*Howell* v. *City of Peoria,* 90 Ill. 104; *Culbertson* v. *City of Fulton,* 127 id. 30; *Prince* v. *City of Quincy,* 128 id. 443; *City of Chicago* v. *McDonald,* 176 id. 404.) And in this case there could be no reasonable ground for contention that the street railway certificates which the statute provides may be issued with which to obtain funds for the purchase or construction of street railways, would, when issued and negotiated, not be the debts of the city issuing them, were it not for the provision found in the statute, which provision has also, in substance, been incorporated in the ordinance of January 18 and the certificates and trust deed or mortgage, that such street railway certificates shall "under no circumstances be or become an obligation or liability of the city or payable out of any general fund thereof, but shall be payable solely out of a specified portion of the revenues or income to be derived from the street railway property for the acquisition of which they were issued." It was, however, held in *City of Joliet* v. *Alexander,* 194 Ill. 457, on page 462: "It is not essential that there should be a right of action on the certificates against the city in order to constitute a debt, where its money or property can be taken in payment." To the same effect is the holding in *Village of East Moline* v. *Pope,* 224 Ill. 386. And while it must be conceded there is no liability resting upon the city to pay said street railway certificates, the question remains, is not the property of the city pledged or mortgaged for the payment of such certificates in such manner as to make said certificates an indebtedness of the city within the constitutional prohibition?

"One who pawns or pledges his property and who will lose the property if he does not pay is indebted, although the creditor has nothing but the security of the property; and so, also, is a mortgagor who is liable to lose his property if he does not pay the money secured by the mortgage." (*City of Joliet* v. *Alexander, supra.*) If all that is proposed to be done in this case is to pledge the property, and its income, which is purchased with the proceeds of said street railway certificates when issued and sold to secure the payment of said certificates, then, under the doctrine of *Winston* v. *Spokane,* 41 Pac. Rep. 888, which has been approved in *City of Joliet* v. *Alexander* and *Village of East Moline* v. *Pope, supra,* there would be no indebtedness, within the constitutional inhibition, created by the issue and sale of said street railway certificates and the execution of said trust deed or mortgage, as against the city. Is, however, the property to be acquired with the fund obtained from the issue and sale of said street railway certificates all the property that is to be pledged or mortgaged to secure the payment of the certificates? What will be purchased with that fund? Clearly not the streets of the city of Chicago on which the street car lines are to be laid and upon which they will be operated, for the obvious reason that the title to these streets and the right to control them were vested in the city prior to the issue and sale of said street railway certificates. It is clear that the funds derived from the issue and sale of said street railway certificates will be used for equipment and construction, such as rails, cars, poles, wires, electric appliances, buildings, labor in laying of track, erecting buildings, etc. And we think it equally clear that a trust deed or mortgage covering only such equipment, when constructed, would afford but an inadequate security for the re-payment of the fund received by the city from the sale of said street railway certificates. This was well understood by the General Assembly when it passed the Mueller law and by the city of Chicago when it enacted the ordinance of January 18, as by

the Mueller law it was provided: "In order to secure the payment of any such street railway certificates and the interest thereon, the city may convey, by way of mortgage or deed of trust, any or all of the street railway property acquired or to be acquired through the issue thereof; which mortgage or deed of trust shall be executed in such manner as may be directed by the city council and acknowledged and recorded in the manner provided by law for the acknowledgment and recording of mortgages of real estate, and may contain such provisions and conditions not in conflict with the provisions of this act as may be deemed necessary to fully secure the payment of the street railway certificates described therein. Any such mortgage or deed of trust may carry the grant of a privilege or right to maintain and operate the street railway property covered thereby, for a period not exceeding twenty (20) years from and after the date such property may come into the possession of any person or corporation as the result of foreclosure proceedings; which privilege or right may fix the rates of fare which the person or corporation securing the same as the result of foreclosure proceedings shall be entitled to charge in the operation of said property for a period not exceeding twenty (20) years." And the trust deed provides, in case of default in the payment of said certificates "there shall be a sale of all the property, both real and personal, and rights and franchises hereby mortgaged, and then and in such event the title to all the property hereby mortgaged, both real and personal, (exclusive of franchises and operating rights,) shall vest in the purchaser at such foreclosure sale, and the purchaser at such foreclosure sale, in addition thereto, shall have the right to construct, maintain and operate the said street railways, property, rights and franchises hereby mortgaged, during the period of twenty years from and after the date of such sale."

If the provision of the statute above quoted does not authorize the city to mortgage the right to operate street

railways in the streets of the city, and if the trust deed or mortgage does not carry the right to use the streets of the city for street railway purposes for a period of twenty years from the date of foreclosure under said trust deed or mortgage to the purchaser at said foreclosure sale, then we are unable to understand the legal import of the language found in the statute and the trust deed or mortgage. It is too clear for argument that under the statute, the ordinance of January 18 and the trust deed or mortgage the use of the streets for street railway purposes is to be mortgaged for the benefit of the holders of said street railway certificates for the period of twenty years after a sale shall be made if the trust deed or mortgage is foreclosed; and if the right to this use of the streets of the city is property, then the trust deed given to secure the payment of the $75,000,000 street railway certificates proposed to be issued is something more than a purchase money mortgage, and, within the doctrine of the *Alexander* and *Pope cases,* these certificates, when issued and sold, and the trust deed or mortgage given to secure them, will create an indebtedness of the city within the constitutional prohibition. In the *Alexander case* the city of Joliet had a water-works system. It was indebted up to the constitutional limit, and in order to extend its water-works system it sought by mortgage to pledge the income of the existing water-works system and that of the extension, and it was held that the certificates thus sought to be secured created a debt within the constitutional inhibition. In the *Pope case* the city of East Moline was indebted to the full amount of five per cent of its assessed valuation, as provided in the constitution. It sought to issue $35,000 in bonds with which to erect a water-works system, and to provide for a tax levy of not more than one cent on the dollar, annually, on all property within the corporate limits of the village for a period of fifteen years, to be used in payment of said bonds. The court said (p. 393) : "In the case at bar it is manifest

that if nothing but the income from the water-works was pledged or could be reached to satisfy the principal and interest of the bonds the case would be within the meaning of the language last quoted, [the language of the *Alexander case;*] but here revenue of the village, to be obtained by general taxation to the extent of one cent on the dollar of taxables, must be applied to the payment of this indebtedness if the income from the water-works proves insufficient to satisfy it."

The law is well settled in this State that a city has a property right in its streets,—that it usually owns the fee; and it has been held that the city may grant a freehold in its streets to a street railway company to enable it to operate its street car lines thereon. In *Village of Harlem* v. *Suburban Railroad Co.* 198 Ill. 337, the railroad company filed a bill to permanently enjoin the village from forfeiting its rights to maintain and operate its railroad in two of the streets of the village. The claim of the railroad company was the village had granted it a perpetual easement in its streets, which grant was denied by the village, and it was held a freehold was involved.

In *City of Chicago* v. *Baer,* 41 Ill. 306, certain property owners attacked a special assessment on the ground the North Chicago City Railway Company's property in the street to be improved was not assessed. The court, on page 312, said: "Now, it is true, as urged by counsel, that the railway company has not become the owner of any portion of these streets in fee, but it has certainly, through its charter from the legislature and its contract with the city, acquired a property in them of the most valuable character, which neither the legislature nor the city can take away without the consent of the company, and capable, like other property, of being sold and conveyed. * * * It is wholly unnecessary to define, for the purposes of this case, what is the precise extent or nature of its property. Certain it is that this railway company has a franchise appurtenant to

this street; that through this franchise it has a right of occupancy in a portion of the street peculiar to itself, and, so far as may be necessary to run its cars, exclusive; that this right of occupancy is secured for a long term of years; that this franchise and this right of occupancy together constitute a property fixed and immovable in its character, like realty, and recognized and protected by the law as fully as a fee simple in land; that this property is of a character to be substantially and directly benefited by the proposed pavement, and that in proportion as it is thus benefited it should contribute its share to the cost of the improvement in common with the other property upon the street."

In *Cicero and Proviso Street Railway Co.* v. *City of Chicago*, 176 Ill. 501, on page 504, the court said: "It is true that the street railway company did not acquire the fee in the street, but by the ordinance the street railway company obtained the right to occupy and use the street for a period of twenty years. Under that grant it took possession of the street, constructed a road-bed, laid down its ties and fastened thereon its rails, and thus acquired the possession and use of the street for the purpose of operating its line of road. The franchise and the right of user constituted property of a fixed and immovable character, like real estate, and, so far as that property is benefited, no reason is perceived why it should not bear its just proportion of the cost of an improvement in the same manner and to the same extent as any real estate which may be contiguous to the improvement."

In *Rich* v. *City of Chicago*, 152 Ill. 18, on page 36, the court said: "As sustaining the construction that railroad right of way in streets is real estate and land, within the meaning of the act authorizing special assessments for local improvements, see, also, *N. I. R. R. Co.* v. *Connelly*, 10 Ohio St. 499; *New Haven* v. *Fair Haven Railroad Co.* 38 Conn. 422; *Railroad Co.* v. *Spearman*, 12 Iowa, 117; *Appeal of N. B. & M. R. R. Co.* 32 Cal. 499; *P. & I. R. R.*

*Co.* v. *Hanna,* 68 Ind. 562; *Ludlow* v. *Trustees,* 78 Ky. 357; *Brighton Railway Co.* v. *St. Giles,* 4 L. R. (Exch. D.) 239; Cooley on Taxation, 458; Pierce on Railroads, 480."

In *New Orleans, etc. Railroad Co.* v. *Delamore,* 114 U. S. 501, the court, in holding that the right of way in the streets of New Orleans, with the franchise to build and use a railroad thereon for profit, was surrendered by a bankrupt corporation as part of its property, said (p. 507): "The contention of the defendant, if sustained, would entirely destroy the value of the property as a railroad, for it is plain that a large part, if not all the line, of the railroad is laid upon the streets and public grounds of the city. If, therefore, the franchise of the right to occupy the streets and public grounds with the railroad track did not pass to the purchaser at the bankruptcy sale, then all that he took by his purchase was a lot of ties and iron rails, which he could be compelled at any time, by the order of the city authorities, to remove. If the law be as contended by the defendant in error, a judicial sale of the railroad and its franchises would be the destruction of both."

It is alleged in the bill that the city of Chicago has heretofore required, as a condition precedent to granting licenses for the use of portions of its public streets for public utility corporations, the payment of compensation, and that it is now receiving from such sources upwards of the sum of $400,000 annually, and that upwards of the sum of $100,-000 thereof is received annually from surface railroads. It is held that the city of Chicago may grant a permanent and valuable right to a street railway company to operate its street railways in its streets and that it may lawfully charge such railway compensation for such use. In *Byrne* v. *Chicago General Railway Co.* 169 Ill. 75, on page 81, the court said: "It is too late to deny to the city the power to grant privileges * * * to street railway companies to lay down tracks and operate them in and along the streets of the city, or the power of such companies to agree with the

227—16

city concerning the terms upon which they will accept such privileges. * * * The city was not limited to a simple denial or granting of the privilege, but might prescribe the terms upon which the privilege should be conditioned, if conferred; and by accepting the ordinances so burdened with terms, the railway company became bound to pay the license fee so long as it enjoys the privileges conferred by the ordinances."

It seems clear, therefore, that the city would, in issuing said street railway certificates and in executing said trust deed or mortgage to secure the payment thereof, be doing more than giving to the holders of said street railway certificates a purchase money mortgage upon the property acquired with the fund derived from the issue and sale of said certificates, as it is obvious the most valuable security which the certificate holder is to receive is the right granted by the trust deed to the purchaser at foreclosure sale to operate the street railways which he may acquire at said sale, in the streets of the city for the period of twenty years from and after the date of his purchase. Without that right the certificate holder would only have a lien on the rails in the street and other equipment of the street railway, which would be of little value without the right to operate said street railways in the streets of the city. By the trust deed or mortgage proposed to be executed by the city to secure the payment of said street railway certificates, in case of its foreclosure and a sale under the foreclosure decree, the city would lose the right itself, or through its grantees or licensees, to use its streets for the period of twenty years from the date of the foreclosure sale for street railway purposes, and also the compensation which it receives, as license fees or otherwise, from the street railway companies now occupying its streets with their tracks, the surrender of which rights would entail upon the city not only the loss of the control of its streets for street railway purposes for twenty years, but would deprive it of many hundred thou-

sands of dollars which would be paid into the treasury during that period by street railways as compensation for the use of its streets upon which to operate their street car lines.

It is claimed the principle involved in special assessment cases should be applied to this case, and that the street railway certificates proposed to be issued should be held, like special assessment warrants, not to constitute an indebtedness of the city. In the *Alexander case* the same contention was made, and the holding was adverse to the present contention of the appellees. On page 464 of the opinion in that case the court said: "The principle involved in special assessments, under which the warrants issued by a city do not constitute indebtedness of a city, cannot be applied to this case. The city is in no way liable for their payment and never owns the fund out of which they are paid. (*Quill v. City of Indianapolis,* 124 Ind. 292.) The improvement, when made, becomes the property of the city, but the cost and expense fall upon the property holder. If more should be collected than will pay the warrants it is rebated to the property owners. If the warrants are not paid the remedy is confined to the property of individuals. A special assessment is a lien upon individual property and not upon property of the city, but in this case the holders of certificates would have a right to take and appropriate a pre-existing income of the city for the payment of the certificates and also to enforce payment by a sale of the property of the city. The certificates would be in no sense chargeable upon the property of individuals, but solely upon the income and property of the city, including property already owned by the city."

It is also urged that even though the city may have a property right in its streets which it can transfer, by ordinance, to a street railway company, which will yield to the city a revenue, it is said when the city grants to a street railway company the right to occupy its streets it rests under no obligation to exact from the street railway company

compensation for the use of its streets, but may grant such use to the street railway company as a gratuity, if it sees fit, and that a court of equity will not control the city in making such grant. (*Roby* v. *City of Chicago,* 215 Ill. 604.) In the case at bar, however, the city does not propose to grant the use of its streets as a gratuity, but to mortgage it for a period of twenty years to secure the payment of the street railway certificates sought to be issued, and, as we have seen, the right which the certificate holder acquires through the trust deed or mortgage is a valuable right, and is upon property other than that which the money which he paid for the street railway certificates of the city purchased, whereby he has acquired a security upon more property than the money paid for the certificates has purchased. We do not think the reasoning in the *Roby case* applies to a case like this.

We have viewed the question here raised from all standpoints, and have been forced to the conclusion, if the *Alexander* and *Pope cases* are right on principle, as we think they are, that the trust deed or mortgage which the city of Chicago is authorized by the ordinances of January 18 and May 28 to execute to secure said $75,000,000 in street rail-way certificates upon the right to operate street railways in the streets of said city for the period of twenty years after the date of foreclosure sale under said trust deed or mortgage, is something more than a purchase money mortgage; that the purchaser at a foreclosure sale of said trust deed or mortgage would secure nothing of value as a street railway unless he acquired the right to operate the street railway which he purchased in the streets of the city, and that such right in no way represents any part of the money derived from the issue and sale of said street railway certificates, and that under the well settled law of this State, as announced in the previous decisions of this court, the issue and sale of said certificates and the execution of said trust deed or mortgage would create an indebtedness of the city

which, in view of its present indebtedness, is of such character as is in violation of section ·12 of article 9 of the constitution, and renders the issue of said certificates illegal and unconstitutional.

This court has nothing to do with the policy of the municipalization of street railways in the cities of this State. It is its duty, however, to enforce the provisions of the constitution as it finds them written in that instrument.   Section 12 of article 9 of the constitution is a wise provision, and must be enforced and applied by the courts until its provisions are changed by the people in the manner provided in the constitution.   In *Dolese* v. *Pierce,* 124 Ill. 140, on page 149, it was said:   "The highest duty and most sacred function of this court is to protect and enforce the constitution, regardless of all real or imaginary inconveniences that may result from doing so."   And in *Village of Hyde Park* v. *City of Chicago,* 124 Ill. 156, on page 163: "The voice of the people is all-powerful when expressed in pursuance of laws that are passed in obedience to the constitution.   But until the people vote to amend or change the constitution in the mode which they themselves have designated, they, as well as their officials, are bound to obey its mandates."

The briefs filed in this case are voluminous and the arguments have taken a wide range.   As the question considered by this opinion is controlling, we have not deemed it necessary to consider herein any of the other questions which have been raised and discussed in the briefs.

Having reached the conclusion that the proposed issue of $75,000,000 in street railway certificates of the city of Chicago, and the execution of said trust deed or mortgage to secure their payment, will create an indebtedness of the city of Chicago beyond the constitutional limit, the decree of the circuit court will be reversed and the cause remanded to that court, with directions to overrule the demurrer to the bill of complaint.

*Reversed and remanded, with directions.*