Dorothy BESTER, et al., Plaintiffs,

v.

CHICAGO TRANSIT AUTHORITY, a public corporation, Defendant.

No. 86 C 1067.

United States District Court, N.D. Illinois, E.D.

Dec. 9, 1987.

Donald G. Peterson, Jack L. Watson, Michael A. Storm, Schaffenegger, Watson & Peterson, Ltd., Chicago, Ill., for plaintiffs.

James P. Daley, Jeffrey A. Blevins, David M. Novak, Joseph J. Stevens, Bell, Boyd & Boyd, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

This lawsuit is brought by employees of the Chicago Transit Authority ("CTA") to require CTA's compliance with the wage and hour rules of the Fair Labor Standards Act ("FLSA"). The CTA claims exemption from these rules prior to April 15, 1986 and compliance with them since that date.

The CTA and its employees are first at issue over the will of Congress in this matter. The employees note that Congress in 1966 enacted amendments to the FLSA [1] extending its reach to workers in mass transit which is the business of the CTA.[2] In 1974 Congress phased out the 1966 overtime exemption for drivers, operators and conductors engaged in mass transit.[3] In 1976, the Supreme Court held that Congress exceeded its constitutional authority by extending the FLSA to state and local government employees engaged in a "traditional and integral government function."[4] The Court did not say whether mass transit was such a government function. From 1976 until 1985, several lower courts sought to decide this question. One of these cases reached the Court but the Court did not reach the question. It decided, instead, that it was wrong in 1976 and that Congress should apply the FLSA to state and local employees.[5]

When the Court overruled its own 1976 decision, state and local governments obviously were concerned about the precise date the newly relevant FLSA would apply to them. Reliance upon the 1976 decision was widespread, and government spending plans cannot be speedily altered without producing effects usually spurned by elected officials. Congress responded to this concern by making some adjustments in the law for governments and by delaying the effective date of the FLSA until April 15, 1986.[6]

It is crucial to understand what Congress meant to do in 1985 about mass transit systems. This Court finds the Congress meant to do nothing about mass transit systems; its intent was to leave the matter to the courts to decide. Congress, aware of pending cases on the question, declined to decide it, and passed the following statutes:

**Liability and Deferred Payments—(1)** No State, political subdivision of a State, or interstate governmental agency shall be liable under section 16 of the Fair Labor Standards Act of 1938 for a violation of section ... 7 ... of such Act occurring before April 15, 1986, with respect to any employee of the State, political subdivision or agency who would not have been covered by such Act under the Secretary of Labor's special enforcement policy on January 1, 1985, and published

---

1. 29 U.S.C. sec. 201 *et seq.* (1982 & Supp. III (1976)).

2. Pub.L. No. 89–601, 80 Stat. 836 (amending 29 U.S.C. sec. 203); *see* S.Rep. No. 1487, 89th Cong., 2d Sess. U.S.Code Cong. & Admin.News 1966, pp. 3002, 3017 (1966).

3. Pub.L. No. 93–259, sec. 21(b)(3), 88 Stat. 68 (repealing 29 U.S.C. sec. 213(b)(7)); *see* H.R. Rep. No. 913, 93rd Cong., 2d Sess. U.S.Code Cong. & Admin.News 1974, pp. 2811, 2824 (1974).

4. *National League of Cities v. Usery*, 426 U.S. 833, 840, 96 S.Ct. 2465, 2469, 49 L.Ed.2d 245 (1976).

5. *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

6. Fair Labor Standards Amendments of 1985, Pub.L. No. 99–150, sec. 6 (amending 29 U.S.C. sec. 201 *et seq.*) (set out as a note under 29 U.S.C. sec. 203 (Supp. III 1985)); Pub.L. No. 99–150, sec. 2(c)(1) (amending 29 U.S.C. sec. 216) (set out as a note under 29 U.S.C. sec. 216 (Supp. III 1985)).

in section 775.2 and 775.4 of Title 29 of the Code of Federal Regulations.

(2) A State, political subdivision of a State, or interstate governmental agency may defer until August 1, 1986, the payment of monetary overtime compensation under section 7 of the Fair Labor Standards Act of 1938 for hours worked after April 14, 1986.[7]

Section 7 of the 1985 Amendments provides that the Amendments

... shall not affect whether a public agency which is ... a political subdivision of a State ... is liable under section 16 of the Fair Labor Standards Act of 1938 for a violation of Section ... 7 ... of such Act occurring before April 15, 1986, with respect to any employee of such public agency who would have been covered by such Act under the Secretary of Labor's special enforcement policy on January 1, 1985, and published in Section 775.3 of title 29 of the Code of Federal Regulations.[8]

The statute can be understood only by reference to the Secretary of Labor's policy. In Section 775.2 the Secretary says the Department will not seek to enforce the FLSA against state and local governments without first giving thirty days notice and would not, in any event, seek liquidated damages for past violations. The Secretary recites the 1976 Supreme Court ruling and notes that traditional governmental functions include schools, hospitals, fire, police and sanitation services, public health, parks and recreation. Section 775.4 adds libraries and museums to the list of traditional services. Congress clearly meant these services to be exempt until April 15, 1986.

Section 775.3 adopts the position urged by the CTA employees here, characterizing as "nontraditional functions", among others, local mass transit, local utilities, liquor stores and off-track betting parlors. Here

Congressional meaning is less clear. The 1985 Amendments "shall not affect whether a public agency ... is liable" when that agency is covered by Section 775.3. This might mean the April 15, 1986 *deferral provisions* of the amendments do not apply, but it also may mean that the *questions* of whether such agencies are liable is not to be affected by the amendments. The legislative history is of some value on this point.

The Report of the Senate Labor and Human Resources Committee on the 1985 Amendments included the following language.

Finally, these amendments do not affect whether employers of state and local governments who are engaged in nontraditional functions as defined by DOL at 29 C.F.R. 775.3—notably local mass transit systems—are covered by FLSA prior to April 15, 1986. The Committee is aware that the question whether transit employees, prior to the decision in *Garcia* were entitled to FLSA compensation for overtime hours worked is still being litigated in federal court. The amendments are intended to protect the rights of both sides to resolve their differences through litigation, without taking a position in this matter.[9]

The Court finds Congress neither approved nor disapproved the Secretary's position on mass transit. Congress had expressed since 1966 a policy of inclusion of local mass transit workers under the FLSA. Implementation of that policy was precluded by the Supreme Court from 1976 to 1985. The principal question before the Congress in 1985 was not the general policy of FLSA—a settled question—but rather the narrow issue of what allowance was to be made for nine years of governmental reliance on judicial ruling. It is not surprising that Congress found the reliance entirely justifiable in cases of police and

**7.** Fair Labor Standards Amendments of 1985, Pub.L. No. 99–150, sec. 2(c)(1), 99 Stat. 788 (amending 29 U.S.C. sec. 216) (set out as a note under 29 U.S.C. sec. 216 (Supp. III 1985)).

**8.** Fair Labor Standards Amendments of 1985, Pub.L. No. 99–150, sec. 7, 99 Stat. 791 (amend-

ing 29 U.S.C. sec. 216) (set out as a note under 29 U.S.C. sec. 216 (Supp. III 1985)).

**9.** Senate Comm. on Labor and Human Resources, S.Rep. No. 159, 99th Cong., 1st Sess. (1985), *reprinted in* 1985 U.S.Code Cong. & Admin.News 651, 663.

fire services and the like, for these services were clearly within the ambit of the Supreme Court's ruling. The justifiability of reliance by mass transit systems was more difficult to assess. Lower courts had disagreed on whether the Supreme Court had meant to include them. It is reasonable for Congress to decide that the meaning of the Supreme Court was a question best left to lower courts since they are well practiced at the task. The Supreme Court itself might sooner or later state its meaning quite explicitly. Moreover, it is possible that some mass transit systems would be exempt under the 1976 ruling and others not; Congress would then leave individual assessments to the courts.

Congress decided that the 1985 ruling of the Supreme Court restoring application of the FLSA would have no retroactive effect and its prospective effect would be limited until April 15, 1986. Congress determined that governmental reliance on the 1976 court ruling entitled government bodies to exemption from liability under the FLSA for the period the ruling stood as well as several more months to allow them to adjust to changed circumstances. Where correct reliance upon the ruling was undisputed, Congress specifically granted exemption. Where reliance was subject to legal debate, Congress left it to courts to judge the debate. And that is now what this Court must do.

The outcome turns upon whether the CTA conducts "integral operations in areas of traditional governmental functions" [10] and the CTA offers its own history in support of its claim.

The historical record is not disputed. In brief, Chicago began with mass transit in 1858 by permitting a company to construct a horse railway. By 1861 there were three such companies. The city set fares and had the right to purchase the companies' assets. At the end of the century many such companies existed with rights to operate street railways each in a specified area of the city. State statute authorized the actions of the city and in 1899 gave the companies the power of eminent domain. But the system of street railways did not work well. A city commission said that either tighter public control of railways or municipal ownership was inevitable. The voters approved municipal ownership in 1902, and a state law to permit this was passed in 1903, but the law was struck down for transgressing state constitutional limits on city debt.[11] The city then exercised the other option of strict public controls to achieve unified service with a single fare and universal transfers under the aegis of one company. An ordinance to achieve this was passed in 1913. A parallel development beginning in 1892 was the creation of the elevated railroad by other companies which were unified in a single rapid transit company. The elevated and surface systems already in receivership [12] were placed under a single company in 1930.[13]

The single mass transit company was privately owned but closely regulated. It constructed many projects required by the city. The city, for its part, was to construct a new subway and create a City Transit Fund. The city had created subways before and in 1888 allowed street railways to use them. The single private company was believed to have failed its promise, and in 1945 the CTA was created by state statute. Within days the city adopted an ordinance giving the CTA full and exclusive right to operate mass transit

**10.** *Hodel v. Virginia Surface Mining and Reclamation Assn.,* 452 U.S. 264, 287, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981) (quoting *National League of Cities v. Usery,* 426 U.S. 833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976)).

**11.** *Lobdell v. City of Chicago,* 227 Ill. 218, 81 N.E. 354 (1907).

**12.** *See People v. Chicago Transit Auth.,* 392 Ill. 77, 88, 64 N.E.2d 4 (1945).

**13.** The history here is derived from H. Weber, *An Outline History of Chicago Traction* (1936); H. Mayer and R. Wade, *Chicago: Growth of a Metropolis* (1969). It is a typical public transportation story in this country. *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 105 S.Ct. 1005, 1007, 83 L.Ed.2d 1016 (1985).

"for the better accommodation of and more economical use by the public."

Now the CTA is a tax exempt municipal corporation with eminent domain authority, run by a board (appointed by the Governor and the city's Mayor). The board can make rules, pass ordinances, issue subpoenas and enter into contracts.[14] Its mass transit system is quite large, extending to every corner of the city, providing 640,000,000 trips per year, and charging fares which amount to half the cost of the ride.[15]

The state constitution declares public transportation serves "an essential public service."[16] The state statute speaks of "an essential public and governmental function."[17] Similar phrases are found in judicial opinions.[18] Opinions from the courts of other states have expressed the same thought,[19] as have members of Congress.[20]

All this establishes what the CTA employees do not, and probably would not want to dispute—that mass transit is essential to the public welfare. But so is electric power, telephone service and natural gas, and the provision of these things is not a governmental function within the meaning of the Supreme Court's 1976 ruling, despite close government regulation of those who do provide them. The great public importance of a service may justify very close government regulation of its providers where the constitutional power to regulate exists, but this does not mean that providing the service is a government func-

tion. Part of the genius of this nation is that much of what is essential is provided by private enterprise. Accordingly the question is not whether a service is essential or a matter of concern to the government, but whether its performance is a traditional governmental function.

The CTA argues that in 1985 the Supreme Court actually concluded that mass transit was exempt under its 1976 ruling. Otherwise the Court would not have reached even the constitutional question of Congress's power to apply the FLSA to the States. This is based on the Court's stated reluctance to decide constitutional questions if such decisions can be avoided.[21] But it is inapplicable here. In 1985 the Court reached the constitutional question because it first found there was no rational way it could decide whether mass transit was exempt under the 1976 ruling. The Court said "We ... now reject as unsound in principle and unworkable in practice, a rule of state immunity from federal regulation that turns on a judicial appraisal of whether a particular governmental function is 'integral' or 'traditional.'"[22] This Court rejects the CTA's argument. In any event, the issue before the Court required the decision of a constitutional question if it were to favor exemption of mass transit. Only if the Court had decided that mass transit was not exempt could the Court have avoided either the overruling of its own precedent or the declaration that Congress had exceeded constitutional limits.

**14.** Ill.Rev.Stat. ch. 111⅔, pars. 319–332 (1985).

**15.** Affidavit of Larry Pianto, CTA's Chief Administrative Officer.

**16.** Ill. Const. art. XIII, sec. 7.

**17.** Ill.Rev.Stat. ch. 111⅔, par. 333 (1985).

**18.** *Fujimura v. CTA*, 67 Ill.2d 506, 513, 10 Ill. Dec. 619, 622, 368 N.E.2d 105, 108 (1977) ("unique governmental function").

**19.** *E.g., Henderson v. MARTA*, 236 Ga. 849, 225 S.E.2d 424, 427 (1976) ("essential governmental functions"); *Mass Transit Admin. v. Baltimore County Revenue Auth.*, 267 Md. 687, 298 A.2d 413, 415 (1973) ("essential governmental function").

**20.** 120 Cong.Rec. 1042 (1974) (Sen. Biden) ("mass transit ... as much of an essential public service as the fire department or hospitals"); 119 Cong.Rec. 4243 (1973) (Sen. Hart) ("mass transit is as much a public necessity as sanitation, police ... and education").

**21.** See *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 345–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). This reluctance is usually greater when there is risk that an Act of Congress will be declared unconstitutional.

**22.** *Garcia v. San Antonio Metro. Transit Auth.*, 105 S.Ct. at 1016.

The problem, of course, is that the Court must now under the 1976 rule determine whether the CTA performs "integral operations in areas of traditional governmental functions." It is daunting, to say the least, to set out on an analysis that a Supreme Court majority says is "unsound in principle and unworkable in practice" but this is, the Court believes, what Congress has required.

One rule of decision is found in *Amersbach*,[23] a 1979 Sixth Circuit case which held a municipal airport operation exempt from the FLSA. The test has four elements and the Court stated them to be:

> (1) the government service or activity benefits the community as a whole and is available to the public at little or no direct expense; (2) the service or activity is undertaken for the purpose of public service rather than for pecuniary gain; (3) government is the principal provider of the service or activity; and (4) government is particularly suited to provide the service or perform the activity because of a communitywide need for the service or activity.[24]

This rule has been quoted by the Supreme Court but neither approved nor disapproved.[25]

The *Amersbach* rule does not quite jibe with the "three requirements" announced by the Supreme Court in 1981:

> First, there must be a showing that the challenged statute regulates the "States as States." Second, the federal regulation must address matters that are indisputably "attribute[s] of state sovereignty." And, third, it must be apparent that the States' compliance with federal law would directly impair their ability "to structure integral operations in areas of traditional governmental functions."[26]

*Amersbach* centers on the value and public nature of the service and the particular suitability of government to provide it. There is no weight given to whether the service is a traditional government function. The *Amersbach* factors are not a wholly sufficient guide to decision in this case. And even if they were it may be that the CTA would fail to meet the condition of providing benefits at little or no direct expense. The fares charged riders are not "little" either in an absolute sense or as a percentage of the actual cost. The rule applied easily in *Amersbach* because airports serve the general public without direct expense to them. There are expenses to be sure, and the public pays them by the usual indirect means of taxes, increased ticket fares and the like. According to the CTA, this is only half true here; the rider pays half the cost.

The importance of direct expense to the public as a guide to decision is doubtful. The First Circuit found fault with the criterion because some clearly traditional government functions require direct payment by the public, such as toll roads.[27] The First Circuit, in fact, assumed but did not decide that mass transit is exempt from the FLSA.[28] The toll road case is relatively easy because building and maintaining the roads, and indeed the toll road, has been a government function since ancient ages. So too for that matter was the maintenance of ports, if not for planes, at least for boats, which perform the same functions as planes.

A correct decision here requires an assessment of the historical reality of government and its rule with respect to mass transit. In 1982 the Supreme Court found that New York's operation of the Long

**23.** *Amersbach v. City of Cleveland,* 598 F.2d 1033 (6th Cir.1979).

**24.** *Id.* at 1037.

**25.** *Garcia v. San Antonio Metro. Transit Auth.,* 105 S.Ct. at 1010 n. 4.

**26.** *Hodel v. Virginia Surface Mining and Reclamation Ass'n.,* 452 U.S. at 287–88, 101 S.Ct. at

2366 (quoting *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976)).

**27.** *Molina–Estrada v. Puerto Rico Highway Auth.,* 680 F.2d 841, 846 (1st Cir.1982).

**28.** *Id.* at 846.

Island Railroad was not exempt as a traditional government function. The state had operated the railroad since 1966 when it acquired it from private ownership. New York argued there was a record of increasing state involvement in railroad operation but, the Court said, this "does not alter the historical reality that operation of railroads is not among the functions *traditionally* performed by state and local governments." [29]

Three Courts of Appeal have found mass transit systems not exempt from the FLSA. The Third Circuit did so despite its recognition that there had been an overwhelming shift from private to public ownership of mass transit from 1960 to 1978. As the Supreme Court found with railroads, the Third Circuit found the historical reality was that operation of mass transit systems is not a traditional government function.[30] The Eleventh Circuit reached the same conclusion after a similar historical review noting that the necessity of mass transit coupled with the apparent inevitable demise of private transit companies does not convert mass transit into a traditional function.[31] The Sixth Circuit, which developed the *Amersbach* test, found the Chattanooga mass transit system not exempt from the FLSA.[32]

The CTA says that public ownership came more recently to the transit systems in those cases than it has to Chicago.[33] This argument is flawed. The determination of traditional functions is not based upon the local history of a particular system but upon a general history of traditional government functions.[34] Were the Court to consider the specific history here, the CTA would still fail. Public ownership

of mass transit began in 1945. The difference between 1945 and 1958 (New Castle Transit) is not enough to establish that a mass transit operation begun in the earlier year is a traditional function and one begun in the later year is not. Though it is difficult to draw a line at the last date one can start a tradition, it seems that 1945 is a year clearly too late to begin a traditional function of state and local government. There was no clear historical state policy favoring government operation of mass transit. The first attempt to do it was frustrated by the state constitution. In its brief the CTA says "After numerous futile attempts to retain a vestige of private participation, the Illinois General Assembly enacted the Metropolitan Transit Authority Act, thereby creating the Chicago Transit Authority, on April 12, 1945." [35] This surely suggests that few thought in 1945 that the CTA was to perform a traditional government function.

Under the tests developed after the Supreme Court's 1976 decision precluding application of the FLSA to state and local governments the CTA does not perform a traditional governmental function and its motion for summary judgment is denied.

**29.** *United Transportation Union v. Long Island R.R.,* 455 U.S. 678, 686, 102 S.Ct. 1349, 1354, 71 L.Ed.2d 547 (1982) (emphasis in original).

**30.** *Kramer v. New Castle Transit,* 677 F.2d 308 (3d Cir.1982).

**31.** *Alewine v. City Council of Augusta, Georgia,* 699 F.2d 1060 (11th Cir.1983).

**32.** *Dove v. CARTA,* 701 F.2d 50 (6th Cir.1983).

**33.** The date government operation began in the cited cases are: 1966 (Long Island Rail Road); 1958 (New Castle Transit); 1973 (Augusta, Georgia); 1973 (CARTA).

**34.** *Brusstar v. Southeastern Penn. Trans. Auth.,* 636 F.Supp. 1557, 1559–60 (E.D.Pa.1986).

**35.** CTA Mem. in Support of Motion for Summ. Judgment at 14.