## Wytheville.

## LYNCHBURG TRACTION AND LIGHT COMPANY v. CITY OF LYNCHBURG.

June 11, 1925.

Argued before Judge Chichester took his seat.

1. STREETS AND HIGHWAYS—*Street Railroads—Land Company Laying Out an Avenue upon County Road—Permission of County Court—Case at Bar.*—In laying out an avenue through its property, it became necessary for a land company to cross several county roads, and also to occupy for a short distance an old county road. The land company petitioned the county court for permission to locate its tracks in the old county road, to cross the other roads and set forth that it proposed to construct a car line through the centre of the avenue, and to leave open on each side a roadway and walkway thirty feet wide for the use of the public. The court granted the permission in accordance with the prayer of the petition.

    *Held:* That this was within the power of the court. So far as the occupation of the county road was concerned, it was a mere change of location, plainly for the benefit of the county.

2. MUNICIPAL CORPORATIONS—*Annexation—City Bound by Reservations in the Dedication of an Avenue to the County—Case at Bar.*—Where a land company dedicated an avenue to a county reserving the right to construct a street railroad on the avenue, a city subsequently annexing the territory succeeded to the rights of the county so far as the dedication was concerned, and was bound by the reservation. It is immaterial whether the land company had power under its charter to operate said railroad as a common carrier or not. It had power to build railroads on its own land, which it might, and subsequently did, dispose of to others who could so operate them, and the right reserved was a valuable one.

3. STREETS AND HIGHWAYS—*Dedication of Highways—Conditions or Restrictions—Annexed to Dedication—Case at Bar.*—Dedication of a highway is a mere gift to the public, and the donor may annex thereto any restriction or condition he pleases, not inconsistent with or repugnant to the gift. Otherwise, there would be no gift. The donee cannot dictate the terms of the gift. He can accept or not, as he

pleases. If he accepts unconditionally, he thereby agrees to perform the conditions annexed to the gift. In the instant case, where donor reserved the right to construct a street railway, the acceptance was unconditional, and the reservation was neither inconsistent with nor repugnant to the gift. The street railway was not an additional burden upon the street.

4. STREET RAILROADS—*Right of City to Exclude from Streets—Repairs and Repavements.*—Usually cities and towns have the right to exclude street railway companies from their streets, and they do exclude them unless they will agree to such terms and conditions as the city or town may impose. A common condition is that the railway company will pave and keep in order the space between their rails and a certain distance outside of the rails. This is the price paid for the privilege, but it cannot be demanded where no privilege is granted.

5. STREET RAILROADS—*Annexation of Territory—Right of City to Exclude from Streets—Repairs and Repavements—Case at Bar.*—In the instant case a street railroad was built wholly on land owned by a land company, or which it had a right to occupy with its tracks. It asked no rights or privileges of the city, and upon annexation of the territory by the city the city had no power to oust the railroad from the street, or to demand that it should pave between or beside its tracks. The city had granted no privilege to the railway company, and could impose no condition. Of course, when the city limits were extended, the railway company became subject to the police power of the city, and it could regulate the speed of its cars, the keeping of the tracks safe and in good condition (as distinguished from the maintenance of the highway itself), the giving of signals, etc.

6. STREET RAILROADS—*Right to Use Streets not Conditioned on Repaving or Repairing—Case at Bar.*—While it was true that, in the instant case, the presence of the rails of a street railway company in a street necessitated a construction adapted thereto, yet the rails were properly placed and carefully maintained in accordance with the reservation contained in the dedication, and, having accepted a dedication of an easement expressly made subject to a valid reservation by the dedicator for the location and use of a railway, the city must bear such increased expense of the enjoyment of its easement as flows from the dedicator's lawful and proper enjoyment and use of the dedicator's reserved rights. The street railway company was doing a lawful act in a lawful way, and this could not give rise to a cause of action in favor of the city.

7. STREETS AND HIGHWAYS—*Street Railroads—Duty to Repave and Repair.*— The primary duty of keeping the streets in order is on the city, and it cannot unload this duty on a railway company unless it shows that, by contract or some legal duty, the street railway company was obliged to do the paving.

8. STREETS AND HIGHWAYS—*Dedication—Reservation of Right to Place Street.
   Railways on Highways.*—An owner of land can dedicate a part of it
   to public use as a highway, and at the same time reserve a right to·
   place in the highway a street railway. Such a right is neither in-
   consistent with nor repugnant to the grant of a highway.

9. STREETS AND HIGHWAYS—*Bridges—Dedication of Bridges—Costs of Main-
   taining Part of Bridge Occupied by Street Car Tracks—Case at Bar.*—
   In the instant case a land company, whose property joined a city
   and was separated from it by a ravine, on application was permitted
   to enter the city to build a bridge or viaduct across the ravine to
   occupy certain streets of the city, and to build a double track street
   railway along a portion of an avenue constructed by it within the
   city limits, including the bridge or viaduct. The land company
   asked the city to accept that part of the avenue, including the bridge
   as "one of the streets of the city," and the city did accept it. The
   dedication of the avenue and bridge was unconditional and without.
   limitation of any kind.

   *Held:* That the dedication imposed no duty upon the city to maintain.
   the street car lines, nor upon the company to maintain other portions
   of the bridge, and that there was an implied covenant on the part of
   the company, in consideration of the grant of the franchise by the
   city, to maintain the part of the bridge occupied by the street car
   tracks in conformity with the condition in which the city kept the
   residue of the bridge.

10. STREET RAILROADS—*Duty to Keep Street in Repair—Absence of Express·
    Contract.*—The weight of authority seems to be that a street railway
    company is bound to keep in repair those portions of streets occupied
    by its right of way even in the absence of any express contract or
    statutory direction to that effect. In the instant case, however,
    the court rests its decision upon an implied contract by which a *quid
    pro quo* was furnished by the franchise granted.

11. STREET RAILROADS—*Repair of Portion of Streets Occupied by Railway—
    Estoppel—Case at Bar.*—In the instant case, a city had several times
    paid for repairs to a portion of a bridge occupied by a street railway
    without calling upon the company to refund the amount.

    *Held:* That under the circumstances of this case the action of the
    city did not estop it from asserting its claim that such repairs should
    be paid for by the street railway company.

12. STREETS AND HIGHWAYS—*Street Railroads—Refund by Street Railway to·
    City for Repairing Area between Tracks—Overhead Expenses.*—For re-·
    pairs made by a city to the part of a bridge occupied by a street rail-
    road, a ten per cent overhead on the actual cost is not unreasonable,
    especially where the city had a contract with the railroad for costs·
    plus ten per cent for other repairs made by the city for the company.

13. STREETS AND HIGHWAYS—*Street Railroads—Refund by Street Railway to·
    City for Repairing Area between Tracks—Items not Authorized by the·*

*Council.*—In an action by a city against a street railroad to recover for repairs made by the city on the area between the tracks of the street railroad, the court did not err in refusing to allow two items of the account sued on, not authorized by the city council.

Error to a judgment of the Corporation Court of the city of Lynchburg in a proceeding by motion for a judgment for money. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*John L. Lee* and *S. V. Kemp*, for the plaintiff in error.

*Aubrey E. Strode* and *T. G. Hobbs*, for the defendant in error.

BURKS, J., delivered the opinion of the court.

This was an action by the city of Lynchburg against the Lynchburg Traction and Light Company to recover for certain repairs made by the city to portions of its streets occupied by the tracks of the traction company. An account was filed with the notice of motion for a judgment, the two principal items of which were, (1) repairs to that portion of Rivermont avenue which was outside of the corporate limits of the city in 1890, and (2) repairs to the Rivermont aqueduct within such corporate limits. The parties waived a jury and submitted all questions of law and fact to the court, which rendered judgment in favor of the city for both of said items. The correctness of that judgment is called in question by the traction company by the writ of error awarded in this case.

In 1890, the northwest limit of the city of Lynchburg was at Jones street, about fourteen hundred feet west of a deep ravine, through which the Blackwater creek passed. The Rivermont Land Company bought several thousand acres of land beyond this northwest boundary of the city, and also bought land in the city extending across this ravine to the city proper. The Rivermont Land Company intended to construct a bridge across this ravine so as to connect its property with that of the city proper. It did construct this bridge or viaduct, 913 feet long and sixty feet wide, connecting its property with the city, and laid out a broad avenue known as Rivermont avenue, extending through its property within the city limits and for a distance of three miles outside of the city limits. This avenue was eighty feet wide and laid out with the purpose of devoting twenty feet in the center of it to a double track street railway, leaving thirty feet on each side for vehicles and passengers, which it proposed to put in first class order for travel. The bridge was so constructed as to carry street railway tracks in the centre thereof. The land company then constructed Rivermont avenue through its newly laid out streets within the corporate limits across the bridge to the intersection of Fourth and Main streets in the city. In laying out this avenue outside the city limits, it became necessary to cross several old county roads or streets and also to occupy for a short distance a part of the old county road, thirty feet wide, known as the Lexington Pike. At this place it was necessary for the land company to obtain permission from the county court to use these portions of the county road system. The land company petitioned the county court to locate its tracks in the old county road, set forth that the company proposed to construct its car

line through the centre of this main avenue, and to leave open on each side a roadway and walkway thirty feet wide for the use of the public. It also asked for authority to construct the lines over the small portion of streets and roads above designated, and this authority was granted by the county court on December 8, 1890. So far as the county was concerned, it amounted to a slight change in the location of the county road for a short distance, giving a better and improved road. Otherwise than small sections of the county road system, the entire three miles of Rivermont avenue was constructed on land belonging to that company. There was no necessity to ask for the privilege to construct a line on its own land, and none was asked. About June 6, 1891, the land company placed its plans A and B on the records of Campbell county. These plans contained a detailed lay out of the property of the Rivermont Land Company, but were not acknowledged in such manner as to constitute a statutory dedication of the highway. Consequently the dedication, it is admitted, was a common law dedication. These plans showed the location of the electric railway through Rivermont avenue and across the viaduct, and also had plainly written upon them the following reservations: "The Rivermont Land Company of Lynchburg, Virginia, reserves to itself the fee in all streets and alleys marked upon this map, and all others which it may hereafter lay out, subject to the use of the same by the public as a highway, but said use to the public is, however, to be subject to the use of said company for the purpose of constructing therein railroads whether to be run by steam, electricity, horse, or any other motive power," etc.

The land company constructed a double track street

railway line in 1890 and 1891 along the center of Rivermont avenue as indicated upon said plans. By deed bearing date February 1, 1892, the land company conveyed its railway lines, and all of its rights of way therefor to the Rivermont Street Railway Company, the predecessor in right and title of the plaintiff in error. Rivermont Street Railway Company was incorporated by an act of the legislature approved December 17, 1891 (Acts 1891-1892, c. 12), and contained the most comprehensive powers. The charter authorized the land company to make sale to the street railway company and to take stock of the latter company in payment. It provided that when consent to construct the railway had been already granted by the council of the city of Lynchburg, or the courts of Campbell and Bedford to any individual or company from which the street railway company may derive any railway or any part of a plant connected therewith, no further grant of such power should be required. It also provided that "when the company shall receive in payment of subscriptions to its capital stock from the Rivermont company, or from any other person or corporation, any roadway, poles and other part of an electric or other plant located on the lands of said subscribing company, or other persons, the company shall take the same and operate them as a street car line without any such permit from said council or county courts, even though the land over which said railway runs and upon which said poles, wires and other plant is placed has been dedicated to the use of the public as a highway, provided said dedication was made subject to said user for the purpose of a street railway." It is perfectly manifest that the powers conferred by this charter were intended to carry into effect the very transactions which after-

wards took place between the land company and the street railway company. The deed used the most comprehensive language and conveyed to the street railway company practically every right which the land company had with reference to the street railway. It certainly conveyed the right of way upon which the track was located, and the rights reserved in the dedication of the land company to the public. It plainly appears that the public were to have the avenue for street purposes but that it was to be subject to the reservations hereinbefore stated. It recognized the fact that the land company had made the dedication *subject to the reservations.*

In 1893, some eighteen months after the street railway company had acquired its deed and the rights thereunder, the Rivermont Company conveyed its assets to Wm. V. Wilson, trustee, and it is claimed that under conveyances through him, the city thereafter acquired the right to the fee in Rivermont avenue. It is doubtful if the city ever acquired such rights, but it is wholly immaterial as the transaction was long after the railway company had acquired its rights.

In 1912, the city determined to improve Rivermont avenue by regrading and macadamizing it throughout its length and breadth. Prior to that time the street railway line was at many places a foot or two above the driveway on either side of its tracks, with crossovers at intervals. The city contracted for doing the regrading and macadamizing the avenue, including the space between the tracks and up to the tracks. The street railway was not a party to the contract and had nothing to do with the regrading and paving; but it regraded its track so as to conform to the city's grading of the street, and had its work done with the very

best material and workmanship. In making the contract for this repaving the city required the paving company to lay wood block liners along the street car tracks and at grade with the residue of the improved street. The other parts of the street, including the street railway area, were to be macadamized with a material called asphaltic concrete. The street railway company adapted its construction to that of the city.

It turned out that this use of wood block liners was only a partial success. Even before the work was entirely completed, the blocks began to buckle and get out of place, and left the street in a bad condition next to the rails.

The work was completed in the fall of 1913. From that time until June, 1919, either the city or the paving company made the repairs caused by the disordered and displaced wood block liners, by either replacing them or filling in the holes left by displacement with other materials.

In June, 1919, demand was made upon the street railway company to make the repairs of this character, but the company refused to do so, whereupon the work was done by the city and the bill for it constitutes one of the large items for which judgment was rendered. It is nowhere claimed by the city that the street railway company had located or used in an improper manner its street railway, or had thereby broken the street or produced the disorder which necessitated the repairs.

As already pointed out, the judgment complained of embraced two items—one for street repairs to that portion of the street outside of the corporate limits of the city as they were in 1890, and which will be designated as Rivermont avenue, and the other for

repairs to the bridge over Blackwater creek, within the then city limits, which will be designated as Rivermont aqueduct. The rights of the street railway company and of the city are not the same as to these two items, hence they will be separately considered under the designations above mentioned.

### Rivermont Avenue.

This item does not involve the construction of any franchise granted by the city, for it granted none, nor the effect of an unlimited dedication by a donor, for there was no such dedication.

The city extended its corporate limits in 1901 and 1908. Prior to that time the street railway company owned and operated a double track street railway for about three miles beyond the corporate limits, in Campbell county. By the amendment of 1901, the city took in about one-third of this line, and by the amendment of 1908, it took in the remaining two-thirds. Before either of these amendments there was already in the city the Rivermont bridge, or aqueduct, and about 1,400 feet between the aqueduct and the corporate limits of the city, but no part of what is here designated as "Rivermont avenue" was within the city limits.

[1] In 1890, the land company petitioned the County Court of Campbell county for permission to occupy "the old streets and roads on Daniel's Hill." The petition states that "this avenue (Rivermont) is to be paved or macadamized in a substantial manner and through and along it the petitioner desires to construct water mains and a tramroad or car line to be operated by electricity. A tracing of said avenue is hereto attached. * * * The company proposes to con-

struct its car tracks through the center of this main avenue and to leave upon either side a roadway and walkway thirty feet wide for the use of the public, which ways are given out of its own land."

The permission was given in accordance with the prayer of the petition. So far as the Lexington Pike was concerned, it was a mere change of location, plainly for the benefit of the county, and within the power of the county court to grant.

[2] In 1895, on the petition of I. H. Adams and others, Rivermont avenue was accepted by the County Court of Campbell county as one of the public highways of the county. This petition expressly referred to the plans A and B of record in the county, which showed the location of the street railway in the avenue, and upon which was noted the reservation made by the land company hereinbefore recited.

There is no doubt of the fact that the county court accepted the dedication subject to this reservation. It had full knowledge of it.

It is very plain that the terms of the dedication were well known. It was a dedication to the public *as a highway*, but the public use of it as a highway was "to be subject to the use of the said company for the purpose of constructing therein railroads, whether to be run by steam, electricity, horses or any other motive power." It is immaterial whether the land company had power under its charter to operate said railroad as a common carrier or not. It had power to build railroads on its own land, which it might, and subsequently did, dispose of to others who could so operate them, and the right reserved was a valuable one.

When the city enlarged its boundaries so as to include Rivermount avenue, so far as the dedication is con-

cerned, it succeeded to the rights of Campbell county. If Campbell county was bound by the reservation, the city was also.

[3] Dedication of a highway is a mere gift to the public, and the donor may annex thereto any restriction or condition he pleases, not inconsistent with or repugnant to the gift. Otherwise, there would be no gift. The donee cannot dictate the terms of the gift. He can accept or not, as he pleases. If he accepts unconditionally, he thereby agrees to perform the conditions annexed to the gift. In the instant case the acceptance was unconditional, and the reservation was neither inconsistent with nor repugnant to the gift. The street railway was not an additional burden upon the street.

[4] Usually cities and towns have the right to exclude street railway companies from their streets, and they do exclude them unless they will agree to such terms and conditions as the city or town may impose. A common condition is that the railway company will pave and keep in order the space between their rails and a certain distance outside of the rails. This is the price paid for the privilege, but it cannot be demanded where no privilege is granted.

[5] In the instant case the street railway was built wholly on land owned by the company, or which it had the right to occupy with its tracks. It asked no rights or privileges of the city. The city simply reached out and took it in. It had no power to oust it from the street, or to demand that it should pave between or beside its tracks. It had granted no privilege to the railway company, and could impose no condition. Of course, when the city limits were extended, the railway company became subject to the police power of the city, and it could regulate the speed of its cars, the keeping

of the tracks safe and in good condition (as distinguished from the maintenance of the highway itself), the giving of signals, the stopping of cars at convenient points, the keeping of watchmen or gates at specified points, requiring cars to be provided with fenders, and other matters appertaining to police regulations, but this gave it no right to require street improvements, or repairs not caused by any unlawful, improper or negligent act of the company, and no such act is here complained of.

What took place was this: In 1912 the city determined to put an improved pavement on Rivermont avenue, on both sides of and between the tracks of the railway, and recognized its duty to pave between and up to the tracks, and in good faith thought that the block liners next to the rails was the best method of construction. The street railway lowered its grade to conform to the new grade of the city. When the work was done it was found that the block liners buckled and came out of place and either had to be replaced, or a substitute provided therefor. It is for work of this kind done in 1919 that the judgment was in part rendered against the street railway company.

[6] It is true that the presence of the rails in the street necessitated a construction adapted thereto, but the rails were properly placed and carefully maintained in accordance with the reservation contained in the dedication, and having accepted a dedication of an easement expressly made subject to a valid reservation by the dedicator for the location and use of a railway, the city must bear such increased expense of the enjoyment of its easement as flows from the dedicator's lawful and proper enjoyment and use of the dedicator's reserved rights.

[7] The street railway company was doing a lawful

act in a lawful way, and this could not give rise to a cause of action in favor of the city. To say that it was as necessary to pave between the rails as outside of them, and that, as the railway company placed the rails in the street, it should therefore pay for paving between them, is simply begging the question. The primary duty of keeping the streets in order is on the city, and it cannot unload this duty on the railway company unless it shows that, by contract or some legal duty, the street railway company was obliged to do the paving.

[8] The main question involved in this branch of the case is whether or not the owner of land can dedicate a part of it to public use as a highway and at the same time reserve a right to place in the highway a street railway. That such a right can be reserved and is neither inconsistent with nor repugnant to the grant of the highway seems to be right on principle, and is sustained by such an array of authorities as would seem to leave the matter free from doubt.

In Ayres v. Pennsylvania R. R. Co., 48 N. J. Law, 44, 3 Atl. 885, 57 Am. Rep. 538, land was designated for public use as a highway subject to the right to designate a portion thereof for use for railroad purposes. It was held that "a dedication of a highway to the public may be made cum onere. State v. Society, etc., 15 Vroom (44 N. J. L.) 502. From all the circumstances the plain intent was to dedicate to public use as a highway the whole width of 100 feet, subject to an easement for railroad purposes over a portion of the center, reserved to, and to be designated by, the grantor, Brown. When that portion should be designated, and devoted to railroad purposes, the easement of the public highway would be suspended over it and continue suspended so long as it was devoted to such

purposes. * * * By that deed (Brown's deed to the railway company) the portion of the street to be used for railroad purposes was designated, and to that extent the railroad's use became paramount to the public use, and will exclude it, so long as that portion of the street is so used."

In *State* v. *Hoboken*, 59 N. J. Law, 383, 36 Atl. 693, the question was not raised by the city, but by private owners of lots who were chargeable with knowledge of reservations on a recorded plat. Much of what is said there applies to municipalities which accept dedications made with reservations. In this case there was a map recorded by the grantor, and streets were laid out and designated thereon as dedicated to public highways for passage over the same by ordinary vehicles and foot passengers only, subject to the right of the grantor to lay tracks for horse cars, steam cars, and elevated railways, all of which rights were expressly reserved as fully and entirely as if no dedication of such lands to any public use had ever been made. In the course of the opinion it is said by the court: "Such dedication constitutes the only right of the city of Hoboken in such streets. The power and jurisdiction over these streets was only obtained by such dedication. On November 2, 1895, the Hoboken Land and Improvement Company, Martha B. Stevens and Mary P. Lewis, by writing under their hands and seals, granted to the Hoboken Railway * * Company the right to lay rails and conduct a railroad in the streets in accordance with the ordinance of the city." The court said further: "A dedication of a highway to the public use may be made *cum onere.* * * * If the use of the soil as a way be offered by the owner under given conditions and subject to certain reservations, and if the public accept the use under

such circumstances, there can be no injustice in holding them to the terms on which the benefit was conferred." See, also, *State* v. *Society, etc.,* 44 N. J. Law 502.

In *Village of Bradley* v. *New York Cent. R. Co.* (Feb. 1921), 296 Ill. 383, 129 N. E. 744, the landowners dedicated land for village purposes and reserved the right to operate a railroad through any street therein, and conveyed such reserved right to a railroad company for a consideration. The railroad company constructed its tracks in the streets and maintained and operated the same. In the course of the opinion, it is said: "A dedication of a highway or street to the public may be made *cum onere. State* v. *Society,* 44 N. J. L. 502. A dedication of land for public use as a street or highway may be made with a reservation to the owner to build and operate a railroad through any street therein named, or through any portion of the plat or addition, or with a reservation to convey such right to others. Under such a reservation, where the owner subsequently conveys the right to build and operate a railroad on any street within the municipality, and such railroad has been built and is in operation, the public use will be suspended and remain suspended so long as that portion is devoted to that purpose. * * * The fee of Washington avenue, by the statutory dedication of the owner, vested in the Village of Bradley subject to the easement reserved and granted to the railroad company. This easement was a property right in the railroad company which it obtained by deed from the original owner of the land and paid $1,250.00 for it. *Lobdell* v. *City of Chicago,* 227 Ill. 218, 81 N. R. 354. The Village of Bradley had no right to take or damage this property without remuneration under our Constitution. Whatever damage the railroad company may sustain from the con-

struction and operation of the public improvement should be allowed, except damages occasioned by police regulation."

In *City of Noblesville* v. *Lake Erie & W. R. Co.*, 130 Ind. 1, 29 N. E. 484, a recorded plat entitled, "donation by William Conner for depot at Noblesville," showed a space marked "lot for depot building," with red lines running by it in the space marked as reserved for streets. It was held that, in construing the plat, the red lines should be considered as designating railroad tracks, and hence the dedication of the street was made subject to the burden of the railroad right of way, and that a dedication of a street subject to the burden of a railroad right of way is valid as such a reservation does not destroy the purposes of the grant (viz., the creation of a highway), or prevent the municipality from exercising police power over the place granted. It is further held that while a donor cannot attach to his dedication any condition that will impair the police power, the dedication of the street as a public highway may be made subject to a right of way for a railroad.

In *Arn* v. *Chesapeake & O. Ry. Co.*, 171 Ky. 157, 188 S. W. 340, there was a written dedication of the streets of a town to public use, reserving to the dedicator the right to control the location of any railroad upon such streets. The dedicator sold this right to a railroad company, which constructed its road in the street. It was held that the public took the street subject to such reserved right, and in the course of the opinion it was said: "The authorities are unanimous, so far as we are aware, in upholding a reservation such as we are considering and in sustaining the right of a railway company to locate its tracks under authority thereof. *Ayres* v. *Pa. R. R. Co.*, 48 N. J. Law 44,

3 Atl. 885, 57 Am. Rep. 538; *Tallon* v. *City of Hoboken,* 60 N. J. Law, 212, 37 Atl. 895; *City of Noblesville* v. *Lake Erie & W. Ry. Co.,* 130 Ind. 1, 29 N. E. 484; *Okla. City & T. R. Co.* v. *Dunham,* 39 Tex. Civ. App. 575, 88 S. W. 849; 13 Cyc. 459; Elliott on Railroads and Streets, section 148."

In *Oklahoma, etc., R. Co.* v. *Dunham,* 39 Tex. Civ. App. 575, 88 S. W. 849, a dedication was made by recorded plat by the owner, Dodge. In the dedication deed the dedicator said: "And I, after reserving the right to grant to any railway companies the right of way over Browning and McClellan avenue, do hereby grant, give and dedicate to the public a highway, such portion of each and all of the streets and alleys designated on said map as may be contiguous to or adjoining any lots * * * laid out on said map." In discussing the subject of dedication, the court, amongst other things, said: "Dodge, at the date of his deed of dedication, had full title to McClellan avenue and of the land of which appellee's lot constitutes a part. He then had in such land every right or privilege that can be carved out of it. He could convey the whole absolutely or such estate therein as he chose upon any or no consideration, as he might desire. He in fact platted the land, and dedicated specific parts thereof to the public as passageways. The dedication of an easement or passageway over McClellan avenue, however, was not made absolute in the general public. Dodge reserved the right, which affected all lands then owned by him, to select one or more railway corporations, to which he might also grant an easement or right of passage over this street. This reserved right, of course, should not be construed as giving Dodge power to thus enable railways to wholly occupy and use the avenues to the entire

exclusion of the general public, for so to construe the provision would constitute a repugnant clause enabling Dodge to entirely defeat the dedication to the public, restricted though it was, and which therefore could not be upheld. In this case, however, the public right is not involved. It is not insisted that the right of the avenue as a passing way has been unnecessarily or unreasonably impeded." See also *Brunswick, etc., R. Co.* v. *Mayor of Waycross*, 91 Ga. 573, 17 S. E. 674.

In 1 Elliott on Roads and Streets (3d ed.), section 163, it is said: "An owner may grant whatever estate he sees fit, and may annex conditions and limitations to his grant at his pleasure; provided that such limitations and conditions are not inconsistent with the dedication and will not defeat the operation of the grant. * * * * Subject to the limitation we have stated, the dedication must, as the law phrase runs, be accepted *'secundum formam doni.'* It is stated in general terms in some of the cases that there may be a partial acceptance, but it seems to us that this doctrine must be taken with some qualification. If the donor should consent that the public might accept part and reject part, then, doubtless, the acceptance, if for the public generally, would be valid; but if he should insist on a full acceptance, we think that on principle he would be sustained by the courts, since to hold otherwise would be, in effect, to compel him to part with his property on terms different from those prescribed in his grant."

A number of cases have been cited by counsel for the defendant in error as tending to show that a dedication cannot be made of a public street, subject to a right of way of a street railway company, or at least so as to deprive a municipality of complete control over the streets for all purposes. Among the cases so cited are,

*Newport News R. Co.* v. *Hampion R. Co.*, 102 Va. 803,. 747 S. E. 839; *Washington, etc., R. Co.* v. *Alexandria,* 98 Va. 344, 36 S. E. 385; *Commonwealth* v. *Portsmouth Gas Co.*, 132 Va. 480, 112 S. E. 792; *Norfolk, etc., Traction Co.* v. *Norfolk*, 115 Va. 169, 78 S. E. 545, Ann. Cas. 1914 D. 1067; *Danville* v. *Danville Ry. Co.*, 114 Va. 382, 76 S. E. 913, 43 L. R. A. (N. S.) 463; *Reading* v. *Minn. Traction Co.*, 215 Pa. 250, 64 Atl. 446, 7 Ann. Cas. 380. All of these cases were either under permits. from the city or upon a state of facts in no way similar to those of the instant case. None of them were cases. where the city acquired its right subject to the right. of way of the railroad company.

It is conceded by counsel for the defendant in error· that the cases cited for the plaintiff in error seemingly sustain the position contended for by the latter.

The position of counsel for the plaintiff in error is. so reasonable and the authorities on the subject apparently so harmonious that we do not doubt that land may be dedicated as a public street subject to a. right of way thereover by a street railway.

### *Rivermont Viaduct.*

[9] The item of $3,150.75 for repairs to the viaduct. stands on a different footing. The viaduct was wholly within the city limits in 1890, and, on the application of the land company long before its conveyance to · the street railway company, it was permitted to enter the city with its work, to build a bridge or viaduct, to occupy certain streets of the city and to build a. double track street railway along that portion of ' Rivermont avenue within the city limits, including· the bridge or viaduct. The land company asked the · city to accept that part of Rivermont avenue, includ--

ing the bridge "as one of the streets of the city," and
the council by appropriate ordinance did accept it
"as one of the streets of the city and named 'Rivermont
avenue.' " This was the grant of a franchise by the
city.

The details of this transaction are thus set out in the
reply brief of the street railway company:

"This sixty-foot wide bridge, 913 feet long, was con-
structed in 1891 by the Rivermont Company on lands
it owned within the city. It spans a deep ravine.
At its southern or southeastern end it connected with
the northern end of Main street where that street
terminated at the top of the south side of that ravine.
Fourth street, at right angles to Main street, also
terminated at the top of the southern side of this
ravine, at the place where but for the ravine Fourth
and Main streets would have intersected.

"From the north or northwest end of the bridge,
Rivermont avenue was laid out within the city for a
distance of 1,400 feet to the northwestern corporate
line. This portion of the avenue, that is from the
northern end of the bridge to the northwestern cor-
porate line, occupied portions of Stonewall and Strange
streets, then public highways.

"The double track railway was built over this bridge
by the Rivermont Company when the bridge was
constructed in 1891, and has ever since been operated.

"By petition dated December 5, 1890, the Rivermont
Company petitioned the city to accept the street as
'laid out' within the corporate limits, and which it
called 'Rivermont avenue.' The company, by its
further petition of December 11, 1890, says it under-
stands there is some apprehension on the part of the
council as to granting the first petition, and states
that the company would undertake to pay all costs

and damages to protect the city against any loss or molestation that might result from the construction of the proposed street within the corporate limits, provided the city would direct the construction and adopt the street when completed.

"The petition shows the streets had merely been 'laid out,' but not graded or constructed.

"The city's ordinance of December 16, 1890, accepted said street within the corporate limits, but provided that nothing in said ordinance should be taken to put on the city the responsibility of keeping the bridge in repair. It also merged a portion of Strange street into the avenue.

"The company was then authorized by the city to grade and improve the avenue at the company's expense, and the city attorney was directed to prepare a contract to be executed by the company for doing the work, which 'shall further provide that the Rivermont Company, or its assigns, shall have authority to construct in said Rivermont avenue a double track electrical street railway.'

"This contract, dated December 17, 1890, was executed. It provides, *inter alia*, that:

" 'The Rivermont Company or its assigns shall have authority to construct along and through said avenue a double track electric street railway.'

"It is an 'agreed fact' that this railway was accordingly constructed in 1891.

"By deed of *February 1, 1892,* in all respects pursuant to the legislative act of December 17, 1891, the Rivermont Company conveyed to the Rivermont Street Railway Company (plaintiff in error's predecessor) the said railway and all rights of way therefor, and across said viaduct. The effect of this deed, and the statute, was to pass to the railway company the rail-

way, the rights of way therefor and all rights apper-taining thereunto.

"Some eight months subsequent to the recordation of the deed in the clerk's office of the corporation court of the city, and nearly a year after the act of the legislature, the *Rivermont Company* petitioned the city to accept a dedication of the bridge. This appears from an ordinance of *September 24, 1892,* reciting that a petition was presented by that company desiring: 'That the city shall take possession of said bridge and treat it in every respect as it does other portions of its streets, by keeping it clean and in proper repair.'

"The council then accepted the dedication 'of the said bridge and assumed possession thereof, with the accompanying obligations to keep the same clean and in good repair for *public use.'*

"This acceptance was on condition that the 'city shall at no time be under any obligations to pay any-thing whatever on account of the original construction of said bridge or any of its appurtenances.' It was a valuable gift.

"This bridge was not, therefore, a part of the city street. The Rivermont Company could only dedicate the rights therein it then possessed. The railway therein, and rights of way therefor, had theretofore been deeded 'February 1, 1892,' to the street railway company, and those granted rights could not be affected or impaired by the grantor's subsequent dedication. The acceptor (city) of the dedication of the bridge, of course, took *subject* to the street railway company's deeded and statutory rights."

The foregoing statement does not fully visualize the situation. On the northwest side of the city but within the city limits there was a small boundary of land wholly inaccessible from the city proper by any kind

of conveyance on account of the deep ravine referred to, through which runs Blackwater creek. Upon this boundary there were certain paper streets. The large boundary of land owned by the Rivermont Company lay beyond and just outside the corporate limits of the city at this place. The Rivermont Company was desirous of connecting its property with the city proper by a first class highway, but this could only be accomplished by building a long and expensive bridge across this ravine, and passing over some of the unopened or paper streets of the city and using certain of its own property within the city limits. The Rivermont Company thereupon proposed to the city to open up a street from the city limits to a point in the city at or near the intersection of Fourth and Main streets, and "to make this a first class and handsome thoroughfare in every respect * * * to be called 'Rivermont avenue.' " This involved the construction of the bridge aforesaid, but it had no right to construct the bridge without the consent of the city. It further asked the city "to accept and adopt this street as laid out and named as one of the streets of the city." The city, by appropriate ordinance and contract, accepted the proposal and permitted the company, at its own expense, to build the bridge and construct the street. This dedication and acceptance was in December, 1890, before any conveyance to this street railway company, and in 1891 the company built the bridge and constructed Rivermont avenue, within the city limits, and without expense to the city. The bridge was sixty feet wide and 913 feet long, and in the center of it was a double track street car line. Both the ordinance and contract aforesaid provided that "the Rivermont Company, or its assigns, shall have

authority to construct along and through said avenue a double track electric street railway."

It seems manifest from these facts that the whole avenue, including the bridge, was to be "a first class and handsome thoroughfare in every respect," and that the whole surface of the bridge was to be opened and used by the public, subject to the right of way of street cars when in operation.

The dedication of Rivermont avenue within the then city limits, including the bridge, was unconditional and without limitation of any kind. It was made by the Rivermont Company while it was the owner of the property and had power to make it. While it was a valuable gift to the city, the arrangement was indispensable to the company. Nothing was said in the ordinance or the contract about the duty of maintenance. What were the rights of the city? It owed to the public the duty to use ordinary care to keep its streets in a reasonably safe condition for travel. The whole surface of the bridge was open to the public and the street railway track was in the center of it. The Rivermont Company was under no obligations to build a street railway line, but, having built it, whose duty was it to maintain it?

The dedication and acceptance were in advance of the construction of the bridge, and while the city was reaping an advantage to its future development and extension, it was granting a franchise that was not merely to the advantage of the Rivermont Company, but vital to the development of the large boundary of land which it had purchased. The bridge was to be constructed, and in fact was afterwards constructed, for use of all kinds of vehicles, and while the street cars had the right of way along the tracks, that part of the bridge was intended for use by other vehicles as well

as by the street cars. The dedication imposed no duty upon the city to maintain the street car lines, nor upon the company to maintain other portions of the bridge. Under the circumstances, we are of opinion that there was an implied covenant on the part of the company to maintain the part of the bridge occupied by the street car tracks in conformity with the condition in which the city kept the residue of the bridge, so that the public might, with safety and convenience, use the entire surface of the bridge which had been set apart and dedicated as a public street. We rest our conclusion on this branch of the case upon this implied covenant, by which a *quid pro quo* was furnished for the franchise granted, independent of the authorities hereinafter referred to, which are not entirely in harmony with each other.

Having arrived at this conclusion, it is unnecessary to make a critical examination of the cases referred to and discussed at length by counsel, but reference is made to some of them to show the divergence of views.

[10] In *City of Reading* v. *United Traction Co.*, 215 Pa. St. 250, 64 Atl. 446, 7 Ann. Cas. 380, it was held that a street railway company is bound to keep in repair those portions of streets occupied by its right of way, even in the absence of any express contract or statutory direction to that effect. In a note to this case in 7 Ann. Cas. 380, it is said: "It is the duty of the railway company by reason of its occupancy of the street to keep in repair the portion thereof occupied by its tracks, and the company is liable in damages for injuries caused by the nonrepair of that portion of the highway. *Montgomery St. R. Co.* v. *Smith* (Ala. 1905), 39 So. Rep. 757; *Citizens' St. R. Co.* v. *Marvil*, 161 Ind. 506, 67 N. E. Rep. 921; *McLaughlin* v. *Philadelphia Traction Co.*, 175 Pa. St. 565, 34 Atl. Rep.

863; *Houston City St. R. Co.* v. *Medlenka,* 17 Tex. Civ.
App. 621, 43 S. W. Rep. 1028; *Laredo Electric, etc., Co.*
v. *Hamilton,* 23 Tex. Civ. App. 480, 56 S. W. Rep.
998. In *Laredo Electric, etc., Co.* v. *Hamilton,* 23 Tex.
Civ. App. 480, 58 S. W. Rep. 998, the court approved
the following proposition: 'The duty of a street rail-
way company to repair the streets which it occupies,
or more definitely, that portion of the street upon
which its tracks are laid, is a general one, requiring no
legislative act or direct agreement to support it, and
such a company is bound to use reasonable care and
diligence to keep the space which it actually occupies
in a safe condition for ordinary travel, failing in which
it must answer for the consequences.' "

In 36 Cyc. 1403, it is said: "A street railroad com-
pany is bound to keep the portion of streets occupied
by its right of way in good condition, even in the
absence of any express contract or statutory direction
to that effect," citing cases from Alabama, Arkansas,
Indiana, Kentucky, Michigan, New York, Penn-
sylvania, Tennessee and Texas. See also P. U. R.
Anno., 1923 A, page 173.

It is said that the reason of the rule is a *quid pro quo*
for the franchise granted.

It is insisted by counsel for the street railway com-
pany that the foregoing authorities are rested chiefly
on *State, etc., R. Co.* v. *Hoboken,* 41 N. J. L. 71, which
has been "much misunderstood" and finally over-
ruled by *Fielders* v. *North Jersey R. Co.,* 68 N. J. L.
343, 53 Atl. 404, 54 Atl. 822, 59 L. R. A. 455, 96 Am.
St. Rep. 552. We cannot concede that the cases cited
are dependent upon the *Hoboken Case,* although it is
cited and relied on, amongst other cases. In the
*Fielders Case* an elaborate opinion was delivered by
Judge Pitney, afterwards a justice of the United States

Supreme Court. Undoubtedly an effort was there made to explain away the *Hoboken Case*, but even counsel for the plaintiff in error was forced to admit that it "seemingly decided" what was claimed for it. The learned justice, however, declared that if the language of the opinion was capable of such a construction, it was an *obiter dictum*. At all events, the *Fielders Case* took a different view and held that "the liability to maintain the pavement, as such, if it exists, must either be rested upon some valid statute or ordinance imposing such a duty, or must arise out of the obligation of a contract."

In 36 Cyc. 1404, it is said: "The duty on the part of a street railroad company to pave the street, or to pay the costs of paving, or a portion thereof, must be imposed by legislative authority, or exist by virtue of some contract, express or implied, and a charter or statute imposing this liability should use language admitting of no ambiguity," citing cases from Indiana, New York and Pennsylvania.

The weight of authority seems to be with the *City of Reading* v. *United Traction Co.*, *supra*, and the other cases hereinbefore cited taking a similar view.

[11] On December 8, 1893, a contract was entered into between the city and the Rivermont Street Railway Company, the predecessor in title of the plaintiff in error. This contract was based upon and intended to carry .into effect an ordinance of the city passed October 6, 1895, whereby the city "granted to said company for thirty years from the date of the execution of this contract the right to construct, maintain and use a street railway from a point where the corporate line crosses Rivermont avenue, along said avenue, and the Rivermont bridge, to Main street," and thence

along certain designated streets. The contract follows the ordinance.

There was a lengthy argument before us, both orally and in the briefs, as to the applicability of that contract to the question now under consideration, but, having held that the street railway company is bound by an implied covenant to make the repairs sued for, it becomes unnecessary to construe said contract.

The city has several times paid for repairs to that portion of the bridge occupied by the street railway without calling upon the company to refund the amount, and this is earnestly relied on as a practical construction of the contract and binding on the parties. This question was raised as far back as 1912 when an agreement was entered into between the parties as to certain passenger rates and the paving of certain streets. "But," as stated by counsel for the plaintiff in error, "this same ordinance contract of 1912, as to paving and repairing of the railway area of streets, did expressly say 'except Rivermont avenue,' " throughout its entire length, including the aqueduct, and "stipulated that the claims and rights of the company in respect to Rivermont avenue should be, and remain, unaffected thereby." At that time the street railway company paid to the city for rights acquired under the contract the sum of $30,000.00. The question of repairs to the aqueduct seems not to have been raised again until 1919 when the refund of the amount now sued for was demanded and refused. It is not clear from the record that the city intended to abandon or release its claim for these repairs. We do not think that the action of the city has been such as to estop it from asserting the claim.

[12] The city assigns as cross-error the refusal of the trial court to allow it ten per cent on the actual costs

of labor and material furnished for repairs to the aqueduct. The trial court refused to allow this because it was a mere penalty. The contract for other repairs made by the city for the company called for costs plus ten per cent. Such contracts are not at all unusual, and it appears from the evidence that ten per cent was a reasonable charge for overhead expenses. The trial court erred in not allowing it.

[13] The trial court committed no error in refusing to give judgment for the two items of the account sued on, to-wit, $93.89 and $253.01, not authorized by the city council.

For the errors hereinbefore pointed out, the judgment of the trial court will be reversed and annulled, and this court will enter final judgment in favor of the city of Lynchburg (defendant in error) against the Lynchburg Traction and Light Company (plaintiff in error) for the sum of $3,465,83, the amount expended for repairs to Rivermont aqueduct, with legal interest thereon from November 19, 1920, until payment, but with costs to the plaintiff in error as the party substantially prevailing.

*Reversed.*