# Richmond

## RICHMOND-ASHLAND RAILWAY COMPANY v. COMMONWEALTH OF VIRGINIA, EX REL. CITY OF RICHMOND.

April 11, 1934.

Present, All the Justices.

The opinion states the case.

*Leon M. Bazile, Alfred J. Kirsh, S. J. Doswell* and *M. A. Hutchinson,* for the appellant.

*James E. Cannon* and *Lucius F. Cary,* for the appellee.

HUDGINS, J., delivered the opinion of the court.

The city of Richmond, on July 7, 1932, adopted the following ordinance:
"That it shall be the duty of the Richmond-Ashland Railway Company to relocate its track where the same crosses Lombardy street, in accordance with a general plan on file in the office of the director of public works of the city of Richmond, marked drawing No. 0-3568, an Ozlin copy of which is hereto attached and made a part of this ordinance. Said track so re-located shall be at grade shown upon said drawing and shall, where the same crosses Lombardy street, be of groove rail construction. Said railway company shall likewise restore the pavement torn up by the removal of its present track and shall re-pave between the rails of the relocated track and for a distance of two feet on either side thereof, with materials corresponding to those now being used by the city of Richmond in the improvement of Lombardy street. All of said work shall be done to the satisfaction of the director of public works."

The railway company declined to furnish the materials and do the work required, on two grounds: (1) That the city was without power to pass such an ordinance, and (2) that even if it had such power the ordinance is unreasonable and arbitrary.

Thereupon, the city filed its petition with the Corporation Commission, praying that the railway company be compelled to comply with the provisions of the ordinance. To this petition the railway company filed an answer, setting forth the above defenses. The Commission held the enactment valid and entered an order requiring the railway company, at its own expense, to comply therewith. From that order this appeal was taken.

The Richmond-Ashland Railway Company is a public service corporation, operating an electric line between the city of Richmond and Ashland. It owns a fee simple title to a strip of land forty feet wide, extending from its terminal in the city of Richmond to the corporate limits and beyond. Part of this strip is in the center of Brook road, which road, or turnpike, was formerly one hundred feet wide. The old Brook Turnpike Company maintained on this 100-foot strip a toll road. In 1910 the turnpike company and the Richmond and Chesapeake Bay Railway Company, from which the Richmond-Ashland Railway Company derived its title, dedicated to the county of Henrico sixty feet of the original one hundred feet, thirty feet to the east and thirty feet to the west of the present right of way for highway purposes, so the forty-foot strip now occupies a space between the north and southbound traffic on Brook road, which has recently been improved and is one of the main highways entering the city from the north. Lombardy street extends from Broad street in a northeasterly direction to Chamberlayne avenue, and crosses Brook road and the right of way of the railway company. This intersection was not within the corporate limits of the city of Richmond prior to the annexation proceedings in 1914. In 1917, the city, by condemnation proceedings, acquired a sixty-foot strip of land to the east of

the crossing, which is now Lombardy street. In 1921, the city, at its own expense and with the consent of the railway company, lowered the street car tracks some two feet and paved the right of way to conform to its plans for improving Lombardy street.

The railway company, in support of its position that the city lacks power to pass said ordinance, contends (1) that the city has merely a permissive right to use the crossing; (2) the Commonwealth has not delegated to the city control of railway and highway grade crossings within the municipality.

Neither of those contentions is sound. While it is conceded that Lombardy street was not opened east of Brook road until 1917, there was filed with the deed (dated February 16, 1910) dedicating the two thirty-foot strips for use as highways a map which shows a highway entering Brook road from the west along the present site of Lombardy street. This map does not show that this highway crosses the forty-foot right of way. Both of the thirty-foot strips were then used as public highways, and the evidence establishes that the public used this intersection for the purpose of passage to and from the eastern thirty-foot strip, which necessarily compelled them to cross the right of way. From this evidence it would seem that the crossing was included in the following paragraph of the agreement between the railway company and the board of supervisors of Henrico:

"(f) The said railway company is to provide and maintain crossings over its right of way at the junction of all established highways, or highways which may be opened for the public."

It appears that the deed of February 16, 1910, divided Brook road into three parts the middle of which, forty feet wide, was the right of way of the railway company and the two strips thirty feet wide were dedicated to public highways; that at that time Lombardy street west of Brook road was open to the public, and in 1917 the city opened Lombardy street east of Brook road, con-

demning for such purpose a strip of land lying immediately east of and adjacent to Brook road; and that in 1921 it graded Lombardy street both east and west of the crossing, when it was agreed by the railway company and the city that the city would grade the right of way of the railroad company and put in a concrete crossing at an established grade. This indicates that it was the intention of the company that Lombardy street should be opened across this right of way, and should be used by the public. Certainly the city graded and paved that part of Brook road lying east and west of the right of way and the right of way with the understanding and intention that all of Lombardy street included in this intersection with Brook road should become a public street and open to public use. Such use has continued for a period of more than five years. This brings the intersection within section 24 of the city's charter, which is as follows:

"Whenever any piece, parcel or strip of land shall have been opened to and used by the public as any street, alley, lane or part thereof for the period of five years, the same shall thereby become a street, alley, lane or part thereof for all purposes and the city shall have the same authority and jurisdiction over and right and interest therein as they have by law over the streets, alleys and lanes laid out by it." This provision of the charter was approved in *Keppler* v. *City of Richmond*, 124 Va. 592, 98 S. E. 747.

All the evidence indicates that the city of Richmond intended that the strip of land in question should be a part of Lombardy street; that the railway company never objected to such a strip of land becoming a part of the street, but, on the contrary, by its action permitting it to be used and improved, without objection, as a part of the street, dedicated it to the public in accord with its contractual obligation. In fact, the answer of the railway company asserts that "it has at all times and is at

the present time maintaining the crossing of its tracks at Lombardy street in good and safe condition."

Simply because the city acquired the right to the intersection as a street after the company had procured a fee simple title to the forty-foot strip and constructed its roadbed has no bearing on the issues here presented. This was settled adversely to the position taken by the city in *Erie R. Co.* v. *Board of Public Utility Commissioners,* 254 U. S. 394, 409, 41 S. Ct. 169, 170, 65 L. Ed. 322, as follows:

"Most of the streets concerned were laid out later than the railroads and this fact is relied upon, so far as it goes, as an additional reason for denying the power of the State to throw the burden of this improvement upon the railroad. That is the fundamental question in the case. It might seem to be answered by the summary of the decisions given in *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Minneapolis,* 232 U. S. 430, 438, 34 S. Ct. 400, 401, 58 L. Ed. 671. 'It is well settled that railroad corporations may be required, at their own expense, not only to abolish existing grade crossings but also to build and maintain suitable bridges or viaducts to carry highways, newly laid out, over their tracks or to carry their tracks over such highways.' *Missouri Pacific Ry. Co.* v. *Omaha,* 235 U. S. 121, 35 S. Ct. 82, 59 L. Ed. 157; *Northern Pacific Ry. Co.* v. *Puget Sound and Willapa Harbor Ry. Co.,* 250 U. S. 332, 39 S. Ct. 474, 63 L. Ed. 1013."

We, therefore, think the Commission was correct in its finding that the crossing of Lombardy street over the right of way of the company at the intersection of Brook road was a public grade crossing.

The railway company further contends that this case is controlled by the decision in *Lynchburg Traction & Light Co.* v. *City of Lynchburg,* 142 Va. 255, 128 S. E. 606, 608, 43 A. L. R. 752. In that case the traction company, or its predecessors in title, dedicated to the county of Campbell as one of the highways of the county, Rivermont avenue, but in the deed of dedication which was

accepted by the county there was reserved * * * "to the use of the said company for the purpose of constructing therein railroads whether to be run by steam, electricity, horses or any other motive power."

It was held that the reservation was neither inconsistent with, nor repugnant to the gift and that the public authorities had accepted the gift subject to the conditions imposed by the donor.

It is not clear from the appellant's brief upon what basis it claims that the Commonwealth has not delegated to the city police powers over grade crossings within its corporate limits. It seems to rely upon the decision in *Richmond, F. & P. R. Co.* v. *City of Richmond,* 145 Va. 225, 133 S. E. 800. This requires a brief review of the policy of the Commonwealth regarding grade crossings.

Prior to the adoption of the 1919 Code, the policy of the Commonwealth regarding grade crossings, both within and without the corporate limits of cities and towns, was defined in ch. 4 of the Acts of 1902-3-4, p. 989 (sections 38, 39), Pollard's Code, sections 1294d (38-39).

Judge Burks in *Richmond, F. & P. R. Co.* v. *City of Richmond,* 145 Va. 225, 253, 133 S. E. 800, 808, in construing this act had this to say:

"Section 39, as is hereinafter pointed out, is applicable to crossings in cities and towns as well as those in counties. It deals with 'existing crossings' as distinguished from crossings 'hereafter constructed.' It contemplates that work might or would have to be done which would result in the 'improvement' of the crossing, and it undertook to provide by whom such improvement should be paid for. It did not limit or restrict the character of the improvement. It might be the repair or reconstruction of a crossing at grade, or it might involve an overhead or underpass crossing.

" 'When such improvement is to be made in a railroad,' that is for its benefit, when the railroad company is the moving party, the party who desires to make a change in the existing conditions, then the company must make

the 'improvement' at its own expense. But if the improvement 'is to be made in a county road, street or other highway,' that is, for its benefit, and when it is the moving party who is asking the change, then 'the expense shall be borne equally' by the railroad company and the county, city or town, as the case may be. Such was the construction placed upon the statute by the trial court, and we think correctly."

The revisors of the 1919 Code incorporated many of the provisions of these sections in Code, sections 3972-3974, but seem to have omitted the provision requiring the railway companies to improve and maintain crossings at grade within the corporate limits of cities and towns. The language used in section 3974 is in many instances similar to that found in subsection 39 of Pollard's Code, but from the context seems to convey a different meaning. The section, in its present form, deals only with the elimination of grade crossings within and without the corporate limits of cities and towns. Whether the provision of subsection thirty-nine, making it the duty of railway companies to improve and maintain such crossings, was left out of section 3974 by design or by mistake of the General Assembly, the court has no power to supply it. It is a general rule that when a revised statute, or one re-enacted for another, omits provisions contained in the original act, the omitted part cannot be supplied by construction. See *Stewart* v. *Kahn,* 11 Wall. 493, 20 L. Ed. 176; *Hobbs* v. *McLean,* 117 U. S. 567, 6 S. Ct. 870, 29 L. Ed. 940; *Murdock* v. *Memphis,* 20 Wall. 590, 22 L. Ed. 429; *Bardes* v. *Hawarden Bank,* 178 U. S. 524, 20 S. Ct. 1000, 44 L. Ed. 1175; *Pirie* v. *Chicago, etc., Co.,* 182 U. S. 438, 21 S. Ct. 906, 45 L. Ed. 1171; *Gaines' Adm'r* v. *Marye,* 94 Va. 225, 26 S. E. 511; *Somers* v. *Com.,* 97 Va. 759, 33 S. E. 381.

In *Richmond, F. & P. R. Co.* v. *City of Richmond, supra,* Judge Burks said:

"In the instant case there has been a full and complete delegation to the city of Richmond of the police power

of the State over its streets, except in the single instance of where an improvement in its streets at an 'existing crossing' of a railroad involves an expense to the railroad, in which case the statute provides that the 'expense shall be borne equally' by the railroad company and the city. This is a condition annexed by the general law to the powers conferred by the charter of the city. The condition, however, is applicable only to 'existing crossings.' If there is no 'existing crossing,' but a new crossing is sought where none existed before, then the delegation is complete and the city may exercise the power so delegated."

In the above case the court was construing the provision of subsection 39, section 1294d, Pollard's Code, which was omitted in section 3974. It follows that if we regard the crossing in question as an "existing grade crossing" within the meaning of the above act, the delegation is complete, for in no statute do we find any express reservation.

It is urged that the provision of the ordinance requiring the railway company to change the location of its tracks is somewhat similar to the provision requiring railroad companies to eliminate the crossing entirely. This the city cannot do, because section 3974 provides that in the event the city, town or other agency of the State cannot, by negotiations with the other parties in interest, eliminate or abolish the crossing, that then they shall apply to the State Corporation Commission "by petition setting forth the facts which in its opinion justify the elimination of such crossings, and said Commission shall hear the complaint as other complaints are heard and determined by that body." That is, before a grade crossing within a municipality can be eliminated by law the municipality must satisfy the Commission that the elimination or abolition of the crossing is reasonably necessary.

The next question presented is whether the ordinance is invalid because its provisions are unreasonable

and arbitrary. It is difficult to lay down or define a definite test by which the reasonableness or unreasonableness of municipal ordinances may be determined. What regulations may reasonably be required or imposed vary with varying conditions. 43 Cyc. C. J. 309. In *Hopkins* v. *City of Richmond*, 117 Va. 692, 86 S. E. 139, 143, Ann. Cas. 1917D, p. 1114, this is said:

"Where the legislature in terms, confers upon a municipal corporation the power to pass ordinances of a specific and defined character, if the power thus delegated be not in conflict with the Constitution, an ordinance passed pursuant thereto cannot be impeached because it would have been regarded as unreasonable if it had been passed under the incidental power of the corporation, or under a grant of power general in its nature. In other words, what the legislature distinctly says may be done cannot be set aside by the courts because they may deem it unreasonable, or against sound policy. But where the power to legislate on a given subject is conferred, and the mode of its exercise is not prescribed, then the ordinance passed in pursuance thereof must be a reasonable exercise of the power, or it will be pronounced invalid. 1 Dillon, Mun. Corp. sections 319, 328, and authorities cited.

"It has been shown above that if the town council of Ashland had authority to pass the segregation ordinance under consideration in September, 1911, it derived such authority from section 1038 of the Code, which is a grant of power general in its nature, or it is an incidental power of the municipality. Therefore the ordinance must be a reasonable exercise of the power conferred.

"Whether a particular ordinance is unreasonable, and therefore void, is a question for the court; but in determining it the court will have regard to all the circumstances of the city and the objects sought to be attained, and the necessity which exists for the ordinance. 1 Dillon, Mun. Corp. section 327; *Toledo, etc., R. Co.* v. *Jacksonville,*

67 Ill. 37, 16 Am. Rep. 611; *Miller* v. *Fitchburg,* 180 Mass. 32, 61 N. E. 277."

We do not find in the charter or the general law an express delegation of the police power of the State over intersections of streets and railway companies' rights of way within the corporate limits of cities and towns. We do find, however, both from the history of the statutes dealing with the subject and the language of the general statutes applicable to cities and towns as well as in the charter itself, that this power is conferred in general terms or may be reasonably implied therefrom. 2 McQuillin Mun. Corp. (2d Ed.) sections 761-762: * * * "courts will review the question as to reasonableness of ordinances passed under a grant of power general in its nature, or under incidental or implied municipal powers, and if any given ordinance is found unreasonable, will declare it void as a matter of law. For in every power given to a municipal corporation to pass by-laws or ordinances there is an implied restriction that the by-laws or ordinances will be reasonable, consistent with the general law and policy of the State, uniform in their operation, and promotive rather than destructive of lawful business and occupations. * * * where the ordinance provisions are more specific and detailed than the expression of general power conferred the court will determine the reasonableness of such provisions."

The ordinance under consideration, in our opinion, is unreasonable. It requires one specific railroad, at one particular crossing, to do four things: (1) To put a reverse curve in its track on its own land; (2) to raise the grade of the crossing some four inches; (3) to replace the present T rails with grooved or girder rails; (4) to grade certain parts of the intersection.

The company, as it had a right to do, laid its track on one side of its right of way, evidently for the purpose of double-tracking its road if business conditions justified such a course. To compel the company to relocate its track upon its own land means that the company will

have to place a reverse curve in its track, which necessarily involves expense, inconvenience, a slowing down of transportation, wear and tear upon its machinery, and, possibly increased hazard to its passengers and employees. If these changes are necessary to the safety of the traveling public, or if the hazard of the crossing will be materially reduced thereby, then the city undoubtedly is clothed with power to adopt the ordinance.

Judge Burks, in *Richmond, F. & P. R. Co.* v. *City of Richmond, supra,* quoted Mr. Justice Holmes in *Erie R. Co.* v. *Board of Public Utility Commissioners,* 254 U. S. 394, 41 S. Ct. 169, 65 L. Ed. 322, as follows:

"Grade crossings call for a necessary adjustment of two conflicting interests—that of the public using the streets and that of the railroads and the public using them. Generally the streets represent the more important interest of the two. There can be no doubt that they did when these railroads were laid out, or that the advent of automobiles has given them an additional claim to consideration. They always are the necessity of the whole public, which the railroads, vital as they are, hardly can be called to the same extent. Being places to which the public is invited, and that it necessarily frequents, the State, in the care of which this interest is and from which, ultimately, the railroads derive their right to occupy the land, has a constitutional right to insist that they shall not be made dangerous to the public, whatever may be the cost to the parties introducing the danger. That is one of the most obvious cases of the police power, or to put the same proposition in another form, the authority of the railroads to project their moving masses across thoroughfares must be taken to be subject to the implied limitation that it may be cut down whenever and so far as the safety of the public requires."

The Commission, in its finding of fact, stated:

"The smooth paving which has been completed on Lombardy street on both sides of Brook road has not been

extended across the right of way because of the controversy here involved.

"The condition of the crossing, while not bad or dangerous, is not commensurate with the condition of the street as it has been repaved in the course of the improvements which have been described.

"While the testimony is to the effect that the crossing can be used without material discomfort at any reasonable speed, an actual inspection makes it perfectly manifest that some repaving is essential in order to conform the crossing to the paving on each side, but the Commission is not prepared to find that such repaving or reconstruction should, of necessity, involve more than covering the present pavement to obtain a degree of smoothness at the crossing at least comparable to that of the street on each side."

In other words, the Commission found as a fact that the crossing, as it then existed, was neither bad nor dangerous, that neither the public safety nor convenience *required* the substitution of grooved rails for T rails, nor did the public safety *demand* the relocation of the tracks from the side to the center of the forty-foot strip. It seems to us that this finding of fact, which is amply supported by the evidence, should have ended the case. The Commission went further, however, and held that the burden was on the company to show in "a very satisfactory manner that the action complained of was so arbitrary and unreasonable as to amount to deprivation of property without due process of law."

This is the test generally applied to an act of the General Assembly in the exercise of the police power reposed in the State and to some powers delegated in express terms to a municipality. The regulation under consideration was an act of the city, made under a general grant of power, the reasonableness of which is governed by the rules heretofore stated.

Of course, as the Commission held, the ordinance is presumed valid until the contrary is shown. As we scan

the evidence, we find no direct testimony to support the contention that the public safety requires the relocation of the track. Mr. Allen J. Saville, former director of public works of the city, testified as follows:

"Q. Would the public safety or the public convenience be promoted in any respect by removing this track from its present location to the center of the right of way?

"A. I can't see any items it would benefit in the way of safety in removing that track. We were entirely satisfied with the location in 1921, and so far as grade is concerned, if it had not have been two feet or more in the air, we would not have made any change there, but that railway was probably built without any regard to the Lombardy street crossing, and they had to lower it, and I think it is a matter of choice, one engineer might want the crown of the street higher than the other one, but that worked safely for sixteen years and while one might want it, as far as operation is concerned, the one put in in 1921 is entirely satisfactory."

"Q. Would it promote the public safety in the silghtest degree to move that track from its present position to the center of the right of way?

"A. I don't see anything to be gained by it, and simply, not as a man familiar with operation, but simply as a matter of common sense, it seems to me that the change of track ten or twelve feet, and an introduction of deflection of the track at a crossing of this kind would really introduce a danger from the operation of the cars from the standpoint of the railroad company."

These statements are supported by other experts, as well as by several laymen, and are not directly contradicted by any evidence introduced by the city.

One of the reasons suggested for the relocation of the track is that better drainage would result therefrom. Colonel Compton, present director of public works, testified that by establishing frequent catch basins, as had been done at other intersections, drainage could be easily and readily arranged without removing the tracks. Mr.

Saville, in answer to the question as to whether the present situation permitted ample drainage on all sides of the car track, stated:

"There is no question about it, the elevations on the map show for themselves from the center of Lombardy street to track crossings the longest distance from the pavement to your track is about 100 feet, and there is a proximate distance of one foot, which is a one per cent grade to the furthest distance off, and the other being some distance apart, that is sufficient distance to take the water off.

\*     \*     \*     \*     \*     \*     \*     \*

"I don't see any difficulty at all as to drainage as the present track is located."

In regard to the T rails, the city engineer testified that it was impossible to construct a pavement against a T rail, and that all railroads, steam as well as electric, operating within the city, were required to put in groove rails at street intersections. This statement was not borne out by the evidence. Numerous witnesses testified that there were a number of railway crossings in the city where T rails were allowed, notably on Cary and Ninth streets and Semmes avenue, and that while there was a difference of opinion among engineers as to whether T rail crossings were as smooth as girder or groove rails it was "perfectly feasible to make a groove in the pavement for a T rail just exactly in the same place as the groove in the grooved girder rail if necessary."

Other witnesses testify to the contrary, which makes a conflict of evidence on this point. To require one railroad to use girder rails and permit others similarly situated to use T rails is an arbitrary exercise of police power.

The testimony detailed above, with the exception noted, is practically uncontradicted and is sufficient to overcome the presumption that the enactment is a valid exercise of police power delegated to the city. In other words, the railway company by this testimony has established that neither the safety nor convenience of the public using

Lombardy street would be promoted, nor the hazard of the grade crossing lessened by compelling the company to change the location of its track or substitute girder rails for those now in use.

There is one other fact which is of minor importance when compared with the safety of the users of of the highway, *i. e.,* that the railway company is insolvent, in that it has not paid operating expenses or the interest on its bonds since January, 1930. At the present time the earnings of the company do not exceed the operating expenses. While this is a matter which should have been, and doubtless was, taken into consideration by the city council, it is also a circumstance to be considered by the court, and when so considered the public need for the expenditure here required should be urgent before so serious a burden is imposed upon the defendant. *Connecticut Co.* v. *Town of Stamford,* 95 Conn. 26, 110 Atl. 554.

It is not altogether clear from the evidence that the present grade of the crossing conforms to the permanent grade adopted by the city. The city undoubtedly has power to require the company at its own expense to make the minor change in grade required by the ordinance, and to pave the intersection to conform to the construction of the street abutting on each side of the right of way. The ordinance only requires the company to pave a part of the intersection. To that extent it is a proper exercise of the power delegated.

For the reasons stated the order will be set aside, the case remanded to the Commission with direction to retain it on its docket for such further proceedings on this ordinance as the city requests, not, however, in conflict with the views herein expressed. That is, if the city desires to compel the railway company to pave so much of the crossing as set out in the ordinance the Commission will, on proper motion by the city, order the railway company to proceed with this work.

*Reversed and remanded.*

GREGORY, J., dissenting.